CITY OF MINNEAPOLIS v. THOMAS B. JANNEY.[1]

May 2, 1902.

Nos. 12,916—(35).

### Deed of Municipal Corporation—Special Laws.

Under the provisions of the charter of the city of Minneapolis (Sp. Laws 1881, c. 76, subc. 4, § 14), as amended (Sp. Laws 1887, c. 15, § 3), authority, in form, was conferred upon the city council, by the vote of a majority of all of its members, to authorize the proper city officers to execute and deliver a deed of conveyance to the Minneapolis Industrial Exposition, a corporation, of certain land belonging to the city, upon which the corporation had already erected its exposition building; said deed to contain certain prescribed conditions. By a further amendment (Sp. Laws 1891, c. 131, § 1), the city council was, in form, authorized to release and relieve the exposition company from the conditions previously imposed in the deed of conveyance, and to relinquish by quit-claim deed all of the right, title, claim, and interest of the city in and to the property previously conveyed.

### Same.

By these acts of the legislature, both conveyances were authorized to be executed without the payment of money and without further consideration.

### Findings—Taxation not for Private Purpose.

The finding of fact, in effect, that the exposition, in form a private corporation, was organized largely, if not wholly, for a public purpose, and that, by reason of the industrial expositions which were given by it, the city acquired and secured for itself great and substantial benefits and advantages, *held* supported by the evidence. *Held*, further, upon the facts, as a matter of law, that the taxation necessarily, although indirectly, resulting from a donation of the property in question for exposition purposes, was for a public, and not for a private, use, and was not obnoxious to the rule that the power of taxation must not be exercised for private purposes.

### Invalid Tax.

To justify a court in declaring a tax invalid on the ground that it was not imposed for the benefit of the public, the absence of a public interest in the purpose for which the money is raised by taxation must be so clear and palpable as to be immediately perceptible to every mind.

[1] Reported in 90 N. W. 312.

#### Duty of State—Education.

It is the duty of the state to promote the educational interests of its people, to encourage their industrial pursuits, to advance their material resources, and to foster their commercial interests, by providing all reasonable facilities therefor demanded by a prudent regard for the growth, development, and general prosperity of its people, and taxation for such uses is not to be tied down to any narrow and mere utilitarian policy.

#### Exhibition a Public Enterprise.

It is beyond question that exhibitions of the nature of those made by the Minneapolis Industrial Exposition are well calculated to advance the material interests, and to promote the general welfare, of the people of the community in which they are made, and that which promotes such an object and facilitates such a result in any community is a public and municipal enterprise, in the truest sense. The proposition that such expositions are so far public in their character and effect as to justify public aid in the form of appropriations is well settled in this country.

#### Right of Taxation.

The right of taxation depends upon the ultimate use, purpose, and object for which the fund is raised, and not on the nature or character of the person or corporation whose intermediate agency is to be used in applying it.

Action of ejectment in the district court for Hennepin county. The case was tried before Pond, J., who found in favor of defendant. From an order denying a motion for a new trial, plaintiff appealed. Affirmed.

*Frank Healy* and *William H. Morse*, for appellant.

*Hahn, Belden & Hawley*, for respondent.

COLLINS, J.

1. Under the original charter provisions of plaintiff city, the common council seems to have been authorized to sell its real property when a majority of the members concluded and considered it for the best interests of the city so to do (Sp. Laws 1881, [p. 441] c. 76, subc. 4, § 14). But there is no necessity to pass upon the question in this case, because by the charter amendment (Sp. Laws 1885, [p. 48] c. 2, § 16) power was conferred upon the council to sell real estate belonging to the city, by a vote of two-

thirds of all of the members thereof. The plain purpose of this amendment was to curtail the already existing power of the council, so that real estate could not be sold by a bare majority vote of its members, as had previously been permissible.

In January, 1886, the city council, by resolution, assured the exposition company, just incorporated, that the property in dispute, belonging to the city absolutely, and not impressed with any special trust, should be conveyed to it in fee, as a site upon which its building might be erected; and thereupon the company proceeded to expend $250,000 in the erection of a suitable structure, in which an exposition was held in the fall of 1886. By an amendment to section 14, supra (Sp. Laws 1887 [p. 447] c. 15, § 3) the legislature authorized the city council, by a majority vote of all of its members, to confer authority upon the proper city officers to execute and deliver deeds of conveyance to the company of the land on which this building had theretofore been erected; this provision being followed by a description of the premises. This act also required that conditions be inserted in the conveyance providing for a reversion of the lands to the city in case of a breach by the grantee company of the conditions prescribed.

It is very clear, from the legislative act of 1887 and the existing circumstances, that it was not intended to restrict the council to a sale of the premises for a money consideration. Such a construction is wholly inconsistent and at variance with the language used, which empowered the council to authorize the execution of proper deeds, and is also opposed to the facts then well known. The authority was to convey, not to sell. The building had already been erected by consent of the council, and upon an assurance that the site would be donated, and a formal conveyance made when legislation could be obtained. Conditions were to be inserted in this conveyance, and, had a sale been intended, there would have been no such conditions imposed; nor would provisions have been required through which reversion would result in case the conditions were not complied with. No doubt can exist as to the intent of the legislature to empower a conveyance as a gratuity and without further consideration.

86 M.—8

But if this were not so, we find another amendment to section 14 (Sp. Laws 1891 [p. 764] c. 131, § 1) by which the council was authorized formally to release the exposition company from any of the conditions imposed upon it in the deeds of conveyance previously executed under the authority of the legislative acts before mentioned. It was then enacted that the exposition company could be released from the conditions imposed, and the council was authorized to relinquish, by quitclaim deed, whenever it deemed it for the best interests of the city, all of the right, title, claim, and interest of said city in and to the property previously conveyed, "including all reversionary rights reserved in its deeds of conveyance to said corporation." An affirmative vote of three-fourths of the members of the council was required by this act. In December, 1891, by vote of more than the prescribed number of its members, a resolution was adopted by the council, and thereafter duly approved by the mayor, in which was recited the fact of the previous conveyance; the conditions made a part thereof; that, in case of failure to perform in accordance with its terms, the conveyed property should revert to the city, together with further recitals as to what part of the conditions had been complied with, wherein there had been default; and that the law of 1891 had been passed, authorizing the council to release and absolve the corporation from further compliance with these conditions. This resolution then directed and empowered the mayor and city clerk to execute and deliver to the company a quitclaim deed in conformity with the provisions of the legislative act.

Under the provisions found in these various enactments, we are clearly of the opinion that in so far as legislative permission was required, or authority could be conferred, both deeds were authorized, and were properly executed and delivered. They cannot be questioned upon the ground of absence of legislative authority to execute and deliver them, without ignoring and disregarding the plain language of these various enactments.

2. The court below found that the exposition company, although in form a private corporation, was in fact organized by its members largely, if not wholly, for a public purpose, and also found that, through and solely by reason of eight yearly industrial ex-

hibitions which were given, the plaintiff city had acquired and secured for itself great and substantial benefits and advantages. These findings are assailed by counsel for the city upon the ground that they are not supported by the evidence. We think they are.

Expositions of this character are not inaugurated or carried forward with a view to pecuniary profit, but are promoted in the hope that they may at least be self-sustaining, and not result in pecuniary loss to the promoters. Profit is not anticipated, and, experience demonstrates, rarely results. The design and purpose is to promote the welfare of the people by bringing them in touch and to a more intimate relationship with many things which are ordinarily in reserve, and usually known or understood by connoisseurs, scientists, or experts only. Through these expositions the arts, the sciences, and the great industries are brought closely to the homes of the common people, and their education advanced along the various lines in which the exhibitors are familiar. The advancement of the municipality in material wealth, and the education of the public, residents, as well as visitors, is the primary object, and there is no expectation of gain otherwise. The fact that a small fee is charged for admission does not affect the statement that the purpose of such expositions is for the welfare, instruction, and education of the people at large. The fee is intended simply to assist in meeting the current expenses and in maintaining the exhibit. It is never made sufficient to produce a profit, and, as a matter of fact, is rarely enough to prevent a financial loss to the owners or stockholders,—a loss usually overlooked because of the immense advantage derived by the public. This custom of charging a small admission fee cannot change the character or purpose of such an exposition from a public to a private enterprise, or be allowed to overthrow the finding that the defendant city derived substantial benefits and advantages from it. It was conceived, established, adapted, and conducted for the acceleration of the growth of the city, to advance its material interests, and to promote the general welfare and happiness of the people. Its object was to aid and benefit the public, and its purpose was a public one, not private.

3. The general nature of the business of the industrial corporation was stated in its articles as follows:

"To establish, maintain, and conduct in the city of Minneapolis, Minnesota, exhibitions and expositions for industrial and other objects, and to receive and place on exhibition industrial and other products, resources, curiosities, and any and all efforts and effects of human art, industry, or skill, and generally to do any and all things which it may legally do, and to that end it may acquire suitable property, and erect suitable buildings thereon, and to rent the same or any part thereof."

The building in question was erected partly upon the land in controversy, and partly ·upon the land to which the city had no claim. In the fall of 1886 an exposition was held, which lasted for a number of weeks. Annual expositions were then held until, and ending in, 1893. The exhibits were large in amount and in variety. Generally speaking, they consisted of products of the arts, sciences, and skilled industries. Woods, minerals, articles of historic interest, curiosities, and all kinds of machinery were presented, including an exhibit by the Edison Electric Company, in full operation, showing the methods of applying and of utilizing electricity for all uses then known. The United States government also made a large exhibit. An art gallery was maintained, in which were exhibited a large number of paintings and statues by noted artists of this country and of Europe. Music was furnished at each of the expositions, a very large amount of money being expended for this purpose. There were one million six hundred thousand admissions to the general exhibit, and six hundred forty thousand to the art gallery, during these eight years. This shows the very general interest which was taken in the exhibitions, and the great patronage given to them by the public. It is obvious from the proofs that great benefit, pecuniary and otherwise, resulted to plaintiff city by reason of these largely attended annual exhibits, commencing in 1886 and ending in 1893.

With this statement of facts, abundantly borne out by the evidence, it must be held, as a matter of law, and upon authority, that the taxation necessarily, although indirectly, resulting from a donation to the company of property belonging to the city, was for public, and not for private, purposes, and was not obnoxious

to that well-known rule that the power does not extend to the exacting of contributions from the people for merely private purposes under the guise of taxation. If by the action of the council the property of the city was appropriated to private purposes, its value must sooner or later be made up through taxation, in violation of the fundamental law; but it is incumbent upon us to point out the specific provision of the constitution, either expressed, or clearly implied from what is expressed, which was transgressed by the acts of the legislature authorizing the conveyances. If there was a violation, the necessary result is taxation for a private purpose.

A court will never declare a statute invalid unless its invalidity is, in its judgment, placed beyond reasonable doubt. This is a well-settled rule. Lommen v. Minneapolis Gaslight Co., 65 Minn. 196, 207, 68 N. W. 53. The presumptions are all in favor of the validity of the legislation called in question. If it be doubtful that the legislature had the power, which it has seen fit to exercise, the rule is that the judiciary will not interfere. This doctrine is well stated in State v. Cornell, 53 Neb. 556, 74 N. W. 59, as follows:

"To justify a court in declaring a tax invalid on the ground that it was not imposed for the benefit of the public, the absence of a public interest in the purpose for which the money is raised by taxation must be so clear and palpable as to be immediately perceptible to every mind." See also Booth v. Town, 32 Conn. 118.

What constitutes a public purpose justifying the invoking of the power of taxation has again and again been stated and elaborated upon, but we find no case in which the subject is so clearly and concisely considered and formulated as it is in Town v. Park, 50 Vt. 178, 192; the opinion being written by Judge Powers. It is impossible to improve upon the language or argument of this learned jurist, which we quote at length:

"It is agreed on all hands that the money of the citizen can be taken under the guise of taxation only when it is appropriated to a public purpose. * * * No formula has yet been devised by which to determine what is or is not a public use or purpose, within the meaning of the constitutional prohibition; but it is

clear that the ultimate advantage of the public, as contradistinguished from that of the individual, is its characteristic feature. It is true that a proposed work may be of great utility to both the public and the individual, and still, according to circumstances, be either public or private in its character and quality. Men set up systems of government in order to subserve certain public ends, and reach advantages that could not otherwise be made available. The state is clothed with the trust of answering these ends. It is not to be limited to the mere duty of governing the people by the exercise of its police power, but it has a higher duty,—to promote the educational interests of the people, encourage their industrial pursuits, develop its material resources, and foster its commercial interests, by providing all reasonable facilities demanded by a prudent regard for the growth, development, and general prosperity of a free people; and the state is not to be tied down to any narrow and merely utilitarian policy in promoting the prosperity of its citizens. The problem is not how little, but how much, can be done to elevate the people to the highest plane of material and political prosperity. Schools, colleges, charitable and reformatory institutions, institutions for the development of the arts and sciences, roads, bridges, canals, and countless other internal improvements, have been established and constructed at the public expense by all thrifty states, ancient and modern, and no serious question has been made as to the propriety of such expenditures."

This same question has arisen in a number of cases where appropriations of public funds have been made by states, counties, cities, or towns in aid of displays of their material resources at the various expositions which have been held in the last few years. In nearly all of them the constitutional provision construed has been similar to the one appealed to and relied upon in the present instance. In some cases the events to be recognized and celebrated by the expositions have been anniversaries of great note and importance, but that fact has never been given much prominence, nor regarded as controlling. No reason can be given why it should be. In one case the court commented on the fact that the anniversary of the admission of the state into the American

Union was to be celebrated, but then said: "The exposition is reasonably expected to attract great and favorable attention throughout the country, and be participated in and largely attended by intelligent and enterprising citizens of numerous other states. * * * It is beyond plausible debate that such an exhibition is well calculated to advance the material interests and promote the general welfare of the people of the county making it. It will excite industry, thrift, development, and worthy emulation in different avenues of commerce, agriculture, manufacture, art, and education within the county, thereby tending to the permanent betterment and prosperity of her whole people. In short it will encourage progress, and progress will insure increased intelligence, wealth, and happiness for her people, individually and collectively. Undeniably, that which promotes such an object and facilitates such a result in any county is, to that county, a county purpose, in the truest sense." Shelby v. Exposition, 96 Tenn. 653, 660, 36 S. W. 694.

Other cases in which the question has been considered, and to which we refer, are Norman v. Kentucky, 93 Ky. 537, 20 S. W. 901; Daggett v. Colgan, 92 Cal. 53, 28 Pac. 51; State v. Cornell, supra; State v. Tappan, 29 Wis. 664.

The proposition that expositions of the character of the one now under consideration are so far public in their character and effect as to justify public aid in the form of appropriations, and that by means of these appropriations public funds are not diverted to private purposes, is well settled by these adjudications. Of course, it is impossible to distinguish between appropriations for expositions in the state or municipality making the same, and appropriations for expositions in other states or municipalities, for in each case the money is taken from the public treasury for identically the same purpose or object, and it must be either a public or private one. But the fact is that the benefits to be anticipated, such as the impetus to present or future growth, the additional prosperity which it brings at once, or the education of the people, must be very much greater where the exposition is to be held in the state or city making the appropriation than where it is to be held elsewhere.

4. It is well settled that the right of taxation depends upon the public character of the objects for which the fund is appropriated, and in no sense can it be made to depend upon the nature or character of the person, natural or artificial, through whom or by whom it is to be applied or used. Thus it was said in Olcott v. Supervisors, 16 Wall. 678, 695, that:

"Whether the use of a railroad is a public or private one depends in no measure upon the question who constructed it or who owns it. It has never been considered a matter of any importance that the road was built by the agency of a private corporation. No matter who is the agent, the function performed is that of the state. Though the ownership is private, the use is public. So turnpikes, bridges, ferries, and canals, although made by individuals under public grants or by companies, are regarded as publici juris."

The late Chief Justice Black, in Sharpless v. Mayor, 21 Pa. St. 147, 169, tersely stated the doctrine as follows:

"But the right to tax depends on the ultimate use, purpose, and object for which the fund is raised, and not on the nature or character of the person or corporation whose intermediate agency is to be used in applying it. A tax for a private purpose is unconstitutional, though it pass through the hands of public officers, and the people may be taxed for a public work, although it be under the direction of an individual or private corporation."

In that case money was levied in aid of the building of a railway, and it was argued that the taxation was for a private purpose, because the money would, in effect, be handed over to a private corporation. The learned justice concluded that the question involved was whether the building of the road was a public or a private affair. "If it be public," he said, "it makes no difference that the corporation which has it in charge is private." The following cases also sustain the same proposition: Town v. Park, supra; Loan Association v. Topeka, 20 Wall. 655; Taylor v. Ypsilanti, 105 U. S. 60.

5. As has been stated, the company expended a large sum of money in the erection of its exposition building upon the strength of the resolution, adopted in January, 1886, and prior to the legis-

lation of 1887. It then gave six annual expositions at great loss. Then came the relieving statute of 1891, and the action thereon. ·Although absolved from the obligation imposed by the conditions, the corporation soon became insolvent, and for this reason exhibitions ceased in 1893, as before stated. In June, 1895, the company found itself obliged to execute and deliver a deed of assignment for the benefit of its creditors to the Minneapolis Trust Company, and it was in due course of these proceedings in insolvency that the defendant herein acquired his title to the property. In view of the resolution upon which was based the expenditure of $250,000 before any legislation, and the great benefit which had been derived by the city from the exhibitions which had theretofore been held, and in view of the further fact that in carrying on this public enterprise the company had incurred great loss, and was on the verge of insolvency, it might be urged ·that there was at least a moral obligation on the part of the city to execute the conveyance in 1887, and later on to relieve the company from part or all of the previously imposed and exceedingly onerous conditions. As bearing on this question, see State v. Bruce, 50 Minn. 491, 52 N. W. 970; Friend v. Gilbert, 108 Mass. 408; U. S. v. Realty Co., 163 U. S. 427, 16 Sup. Ct. 1120; Guthrie Nat. Bank v. Guthrie, 173 U. S. 528, 19 Sup. Ct. 513.

Our conclusion is that the order of the lower court should be, and it hereby is, affirmed.