Hager, Auditor, v. Kentucky Children's Home Society.

CASE 31—CONTROVERSY ·BETWEEN S. W. HAGER, AUDITOR, AND THE
KENTUCKY CHILDREN'S HOME SOCIETY, INVOLVING THE CONSTITU-
TIONALITY OF AN ACT OF THE KENTUCKY LEGISLATURE APPROPRI-
ATING $15,000 ANNUALLY TO SAID SOCIETY.—DEC. 7.

# Hager, Auditor, v. Kentucky Children's Home Society.

APPEAL FROM FRANKLIN CIRCUIT COURT—JOHN D. ·CARROLL, SPECIAL
JUDGE.

FROM THE JUDGMENT THE AUDITOR APPEALS.    AFFIRMED.

PAUPERS — DESTITUTE  CHILDREN — APPROPRIATION — CONSTITUTIONAL
LAW—STATUTE'S CONSTRUCTION.

1. Under Kentucky Statutes 1903, section 3933, and sections 3058,
   3290, 3490, giving over to the counties and cities, respective-
   ly, the care of the poor generally, the State is not precluded from
   appropriating funds for the benefit of destitute children of the
   State, as provided in Act February 20, 1904 (Acts 1904, p. 33,
   c. 7), appropriating $15,000 annually for that purpose.
2. The appropriation under the act of ·ebruary 20, 1904 (Acts 1904,
   p. 33, c. 7), of $15,000 annually to a private corporation organized
   under the laws of the State for purely charitable purposes, and
   conducted solely to seek out destitute children and provide for
   them homes, and where they will be under supervision of the
   institution during their minority, is for a public purpose, within
   Constitution, sec. 171, providing that taxes shall be levied for
   public purposes only.
3. Nor is it repugnant to Constitution, sec. 177, providing that
   the credit of the State shall not be loaned to any corporation,
   and that the State shall not make a donation to any corporation.
4. A contention that as the State does not appoint the officers
   of the corporation, and can not remove them, and can not con-
   trol the appropriation of the money appropriated, the appropria-
   tion amounts to a gift, within ·Constitution, sec. 177, providing
   that the State shall make no donation to any corporation, is un-
   tenable, in view of the proviso of Act February 20, 1904 (Acts
   1904, p. 33, c. 7) that no part of the appropriation shall be paid
   until the corporation has executed a bond to the State stipulat-
   ing that all money so appropriated shall be applied to the care of

homeless and destitute children, of the State; that the bond shall be subject to the approval of the auditor of public accounts, and kept as a record in his office, and that the corporation shall make an annual, verified statement to, and settlement with, the auditor of public accounts, showing when, where and how the funds have been applied.

5. A contention that under the charter of the Kentucky Children's Home Society, providing that the "corporation may adopt by-laws not inconsistent with the laws of Kentucky or the articles of incorporation of the society, and in harmony with the Children's Home Society (National)," the money appropriated by the State pursuant to Act February 20, 1904 (Acts 1904, p. 33, c. 7), appropriating $15,000 annually to the society for the purpose of seeking out destitute children and providing for them homes, will be applied to objects of charity having no direct claim on the State, is untenable, in view of the proviso of the act that the by-laws of the society must not be in conflict with the laws of the State restricting the appropriation to the use of Kentucky children, and compelling all money not so used to be covered into the State treasury, and Kentucky Statutes 1903, section 331c, making it unlawful for any person to bring into the State destitute children, unless they are his own, or nearly related to him, and with the intention of taking them into his own family.

6. Under Constitution, section 59, subsection 29, inhibiting special legislation on particular subjects, and providing that in all other cases no special law shall be enacted where a general law can be made applicable, and sections 58 and 230, requiring all appropriations to be made by the Legislature, a contention that Act February 20, 1904 (Acts 1904, p. 33, c. 7), appropriating money for the benefit of the destitute children of the State to a particular, private, charitable institution, organized under the laws of the State, is special legislation, within the inhibition of section 59, is untenable, as the selection of one agency to apply the money so appropriated, from the nature of the case, calls for an act of appropriation applicable to it alone.

7. Act February 20, 1904 (Acts 1904, p. 33, c. 7), appropriating $15,000 annually to a particular charitable institution, incorporated under the laws of the State for the benefit of destitute children of the State, constitutes a mere gratuity, alterable both as to the amount and manner of application at the pleasure of the Legislature; and hence a contention that it creates an indebtedness against the State is without merit.

N. B. HAYS, ATTORNEY-GENERAL, ATTORNEY FOR APPELLANT.

1. Kentucky Statutes, sections 325, 2008, 2009, 2010, 2011, 2012,

2013, and chapter 102, Kentucky Statutes, make full ·and complete provisions for the homeless, dependent and neglected children of this Commonwealth.    Hence, we contend, the act in question is special legislation and is in conflict with subsection 29 of section 59 of the Constitution and of section 60 of the Constitution.

2. This act of the General Assembly in question is a continuing and permanent appropriation out of the State treasury to the appellee.    Said act makes an annual appropriation of $15,000 to this institution; and if held to be constitutional, it fastens on the taxpayers an annual debt of $15,000 for all time to come, and then it will require the co-operation of both houses of the General Assembly and the Governor to repeal it.

3. It seems to us that the constitutional convention and the people of Kentucky could not have prohibited this in plainer words than they did in section 177.    Here they first declare the "credit of the Commonwealth shall not be given, pledged or loaned to any individual, company, corporation or association or municipality  .  .  ."    And then it emphasizes the inhibition as follows: "Nor shall the Commonwealth  .  .  .  make donation to any company, association or corporation."

4. Our charitable institutions are all under the direct control and supervision of the State; the commissioners, superintendents, stewards and board of trustees are agents of the State and subject to removal, and owe an accountability to the State; but in the selection of the officers of appellee and its management the people of the State who are to be the burden bearers of this debt have no voice whatever.

5. After the State has made ample provision for the care of the blind, deaf and dumb, feeble-minded, insane, house of reform, and the general statutory provisions for our idiots, paupers and homeless, dependent and neglected children, all under State supervision, will it be contended that the appellee, as a volunteer agency of the State, without any State supervision, shall be given annually, in advance, and before any of the alleged public service has been rendered, $15,000 to be expended on its own selected objects of charity?

J. H. HAZELRIGG AND W. S. PRYOR, ATTORNEYS FOR APPELLEE.

The purposes of the institution, as set out in its charter, are public purposes beyond doubt, and to the end that the money "shall be applied to the purposes of the charter of said society— that is, to the care, support and maintenance of homeless and destitute children in this Commonwealth, and providing homes

for same" (see language of the Act 1904, p. 34)—a bond is required so stipulating.

The society is then to make "an annual verified statement and settlement with the auditor, showing when, where and how said funds or appropriations have been applied or disbursed." And, moreover, any failure to properly apply the fund works a forfeiture of the bond, and the money not properly expended would have to be paid back into the treasury as "unexpended" money, as the act provides. Undoubtedly the State has thus provided for an oversight and supervision of the expenditure.

On the general question we refer the court to some very instructive cases, which possibly have not been cited in the briefs: State v. Davidson (Wis.), 58 L. R, A., 739; Daggett v. Colgan, 92 Cal., 53, in line with Norman v. Board, &c., 93 Ky., 537; Minneapolis v. Janney, 86 Minn., 111. See, also, 123 Mo., 424, and Henderson v. Board, 13 L. R. A., 169.

OPINION OF THE COURT BY JUDGE O'REAR—AFFIRMING.

This appeal involves the constitutionality of the act of General Assembly approved February 20, 1904 (Acts 1904, p. 33, c. 7), appropriating $15,000 annually to the Kentucky Children's Home Society, a private corporation organized under the laws of this State for purely charitable purposes. The articles of incorporation of the society show that it is conducted solely to seek out destitute children and provide for them homes where they will be under the supervision of the institution during their dependent minority. The constitutionality of the act is assailed on several grounds, which will be taken up in order.

That the care of the indigent poor is a purely public charity is not really questioned by the attorney general. Christ commended it as a public privilege, whilst every civilized people upon the earth now regard it as a public duty. That great evasive question propounded in the adjustment of the first social relation of men, "Am I my brother's keeper?" is answered emphatically in the affirmative upon the consciences of this era of civilization, when speaking of the destitute and helpless. In this State, from its earliest history, it has

been treated, as it had been in Virginia and England before us, as a public charge imposed as a matter of rightful exercise of governmental power upon the State, or such subdivisions of it as legislation might provide. It was borne by taxation, in one form or another, applied to such subjects and under such conditions as addressed themselves to the lawmaking branch as being the most expedient. Whatever errors may have been committed so far in its exercise, it is doubted if any has occurred on the side of its having been more liberal than just. The care of the insane, the special education of the deaf and dumb, the blind, and of the feeble minded, are particular applications of this general doctrine. They are all well provided for by the statute laws of this State, and have been for many years. Separate institutions, especially fitted and officered for the appropriate service in each are established and maintained at the public expense by taxation levied upon all the taxable property in the State. The care of the indigent poor generally is given over to the counties (section 3933, Ky. St., 1903) and cities of the Commonwealth. Sections 3058, 3290, 3490, Ky. St., 1903. Instead of this being an exclusive delegation by the State of this governmental function, it is its exercise by the State in the limited manner indicated by the several statutes, by the use of local government subdivisions. But the State is not precluded by these several provisions from exercising some part of the same power in some other proper way. It would scarcely be argued that, because legislation had been adopted making it the duty of the counties of the State to provide for their pauper citizens, the State itself could not take on any part of that burden.

The Constitution provides that taxes shall be levied for public purposes only, and forbids the donation or loaning by the State of its credit to any individual or corporation.

Sections 171-177, Const. That the purpose of the appropriation in this case is a public one is too clear, in our opinion, to require more extended argument. Obviously appropriations of money out of the treasury must be measured by the same test as that by which it is raised by taxation and put into the treasury. If taxes could not be imposed for a purpose, money already in the treasury could not be appropriated to that purpose.

The purpose being a public one, for which the State might have levied a tax and applied it, the question immediately recurs, can the State apply it otherwise than through its own officers? At this point section 177 of the Constitution is invoked by the attorney general. That section reads: "The credit of the Commonwealth shall not be given, pledged, or loaned to any individual, company, corporation or association, municipality, or political sub-division of the State; nor shall the Commonwealth become an owner or stockholder in, nor make donation to, any company, association or corporation; nor shall the Commonwealth construct a railroad or other highway." There was a time when the State was allowed to subscribe, and did subscribe, to the capital stock of various quasi public improvement companies, and loaned or gave its credit to such. It was to prevent a repetition of that practice by the State that the section was enacted. It was to keep the State out of partnership enterprises, or even the doing solely on its own behalf of that class of public works—the building of highways and railroads. The State can not now loan or give its credit to any person or corporation for any purpose—public or otherwise. But this does not mean at all that the State can not buy and pay for what it needs to enable it to discharge its governmental duties. Nor does it mean that the State can not employ the services of a person or corpora-

tion to do a lawful act which it has the right to have done, and to pay for it. For example, the State may provide for the mobilization of the militia at a given point. It may hire a railroad corporation to transport them, and some other person to provision them, and may pay for these services. This is in no sense donating or lending the State's credit to the railroad company or to the caterer. Yet the State is not bound to avail itself of their services, but it may do it. If it does, the transaction in no wise involves section 177 of the Constitution, though it does section 171; i. e., the purpose for which the State's money is paid out must be a public purpose. That is the only inquiry, other than that, has the Legislature enacted the statute allowing the thing to be done? When the Legislature is authorized to do a thing generally, and no particular method is prescribed, it may pursue its own course in the means adapted to the accomplishment of the purpose. For example, it is admittedly a public purpose for the State to support at the public expense its pauper lunatics and idiots. It might have kept them all in its own institutions. It might have compelled the counties to keep one class, as it did for a while, or to keep either class or both. But it employs its own institutions in the care of the former, and hires individuals at so much per year for each pauper idiot kept, to care for the latter. Cooley, in his work on Taxation (2d Ed.) p. 125, lays it down that the State, in its care for such dependent objects, might not only do it by an establishment of its own institutions for the purpose, "but," be says, "private institutions might undoubtedly be aided with public funds, in consideration of services to be rendered to the public, and expenses to be incurred by them in assisting and relieving the same necessitous and dependent classes."

In 1899 a terrific cyclone struck the city of New Richmond, Wis., devastating its homes and business houses, killing outright a great many people, seriously injuring a great many others, killing large numbers of animals, and causing widespread disaster, want, and distress. The conditions were such that, but for immediate relief beyond the reduced powers of the city and its inhabitants to meet disease and pestilence, in addition to the other woes occasioned by the storm, would in every probability have followed. The city incurred a heavy debt to meet the critical emergency —one, in view of the severe visitation upon it, it could ill afford to bear alone. The State Legislature voted an appropriation to defray and thus carry in part this burden. Its payment was resisted on the ground that the State had not the right to tax all its inhabitants for the benefit of those of New Richmond alone. The Supreme Court of Wisconsin upheld the appropriation (State of Wisconsin ex rel. City of New Richmond v. Davidson, 88 N. W., 596, 90 N. W., 1067, 58 L. R. A., 739) on the ground that it was for a public purpose. The court said: "The State at large was concerned in the objects of the appropriation in question, and if the Legislature had been in session June 12, 1899, it might legitimately have appropriated the amount mentioned for the object in question. This being so, it follows that the Legislature had the power to pass the act in question to reimburse the city for such expenditures." The court admitted that, unless the purpose was a public one, there was no power under the Constitution to appropriate the State's money to do it, no matter how laudable it may have been.

The Legislature of Missouri appropriated $50,000 to the St. Louis Insane Asylum, an institution owned and conducted by the city of St. Louis alone; the appropriation

being "for the support of the indigent insane in the insane asylum in the city of St. Louis, who belong to the State outside of the city of St. Louis." The payment of the appropriation was resisted on the grounds that it was not for a public purpose; that the State had otherwise provided for the care of its indigent insane; that the Constitution of Missouri expressly prohibited such appropriations in the following provision: "The General Assembly shall have no power to make any grant, or to authorize the making of any grant of public money or thing of value to any individual, association of individuals, municipal or other corporation whatever." The Supreme Court of Missouri upheld the appropriation. State ex rel. City of St. Louis v. Seibert, State Auditor, 123 Mo., 424, 24 S. W., 750, 27 S. W., 624. The court reasoned thus, in part: "The insane of the State being proper objects of charity, some of the insane of the State outside of the city of St. Louis being supported by the St. Louis Insane Asylum, the Constitution authorizing an appropriation for their support, unless prohibited expressly or by reasonable implication, the question is whether there is such prohibition. The words of the Constitution do not contain a prohibition." The language of the provision first quoted is then set out, the court continuing: "The appropriation is for the 'indigent insane of the State outside the city of St. Louis,' and not for the institution. There is no prohibition here unless the State has no power to dispense its public charity through the agency of a private institution. There is no constitutional inhibition against its doing so. . . . But a private corporation or individual may be the recipient of the funds of taxation, provided that the use be a public one." "We can see no reason why the insane of the State,' concludes the court, "not belonging to the city of St. Louis, who are

found in the city, may not be cared for and supported in
its insane asylum at the public expense, if it can be as well
and economically done."

In the case of Shepherd's Fold of the Protestant Church
in New York v. The Mayor, 96 N. Y., 137, the object of the
corporation was to receive, adopt, keep, support, and educate
orphan or friendless children, and the commissioners of
charities and corrections were authorized to transfer eligi-
ble orphans and friendless children to it. In consideration
of the corporation taking care of these children, an appro-
priation of $5,000 annually was made for the benefit of
the corporation. A provision of the Constitution of the
State prohibited the giving or loaning of the money of the
State to or in aid of any association or private undertak-
ing, and also prohibited the counties and cities "from giving
their money in aid of any individual, association or corpor-
ation for the support of their poor." The court held that
caring for the poor of the city through the instrumentality
of the private corporations was not prohibited, and the Legis-
lature had power to authorize the city to provide for the
burden assumed by plaintiff and cast upon it by the act of
1868, by payment of a gross sum. The fact that the cor-
poration might also receive subjects for which the city would
in no event be liable was held not to be materail, as the city
was only paying for what it got.

In Norman, Auditor; v. The Kentucky Board of Managers,
93 Ky.; 537, 14 R., 529, 20 S. W., 901, 18 L. R. A., 556,
this court construed the two sections of the Constitutions
now involved—sections 171 and 177. In that case an appro-
priation had been made by the Legislature to the appellee
board, a corporation, to enable it to make an exhibit of the
resources of our State at the World's Columbian Exposi-
tion at Chicago. The court held the purpose to be a public

one, and that the appropriation was not a loaning of the credit of the State. It was said: "The commissioners selected to expend the money are merely the State's agents to do so, and provide the exhibit for the benefit of its people. The Legislature had the power to provide the means for such a purpose." A similar construction of almost identical constitutional provisions was had in Daggett v. Colgan, 92 Cal., 53, 28 Pac., 51, 14 L. R. A., 474, 27 Am. St. Rep., 95, and in City of Minneapolis v. Janney, 90 N. W., 313, 86 Minn., 111, both citing and following Norman v. Board, *supra.*

In House of Reform v. Lexington, 112 Ky., 171, 23 R., 1470, 65 S. W., 350, there was involved the power of a city of the second class to appropriate $5,000 to the houses of reform, State penal institutions for the correction of incorrigible youth. It was held that the Legislature had conferred upon the municipality the power to provide itself with houses of reform for the keeping of its juvenile criminals, and that, having the power to do that, it might do less by procuring the State to locate its reform houses so that the city could avail itself of the peculiar advantages afforded by their proximity for caring for the former's youthful criminals, the city paying what was deemed a proper equivalent for that service. Section 179 of the Constitution makes the same restrictions against a municipality's donating its money or loaning its credit that section 177 does concerning the State. In considering whether that was a loaning of its credit or donation of its property, the court said: "To hold that a branch of government, such as a county or city, could not exercise a governmental function required of it by the law by employing the service to be done—such as the care of smallpox patients in a hospital owned by a corporation other than the city—or that it might not buy a

supply of water for the public use from a corporation without
the city having the means of furnishing it to the city, would
be to place a narrow and restricted construction upon the
section, not warranted by the evils existing at the time of its
adoption, and which were manifestly sought to be cured by
the convention, as well as to materially hamper municipal
subdivisions of State in the exercise of necessary powers and
discretion in government."

These authorities clearly settle that the vital point in
all such appropriations is whether the purpose is public;
and that, if it is, it does not matter whether the agency
through which it is dispensed is public or is not; that the
appropriation is not made for the agency, but for the object
which it serves; the test is in the end, not in the means.
The limitation put upon the State government by the people
is as to what things it may collect taxes from them for,
to which it may apply their property through taxation; not
upon the means by which or through which it will do it.
It may well and wisely be left to the Legislature to say
how it will dispense the State's charities.   Varying condi-
tions, improved methods of treatment, changing circumstan-
ces affecting the ability of the people to provide for such
charges, all bear upon the legislative discretion, and doubtless
find a proper application in the measures finally adopted
by that body.   Yet back of all that must exist the power to
do the thing in question—the power to make the provision.
It is this power alone that the courts can deal with, and
then only to the extent of determining whether it exists.
Whether it is exercised, and how exercised, are manifestly
matters of exclusive legislative discretion.   What is this
Kentucky Children's Home Society?   A number of people
in this State have organized a corporation of that name.
It has no capital.   It can make no profit to its stockholders

or officers, and can declare no dividends.   It has been al-
ready stated that it seeks out helpless, homeless children,
cares for them, and places them in homes selected by the
institution, and where the little ones may be adopted into
suitable families.   The last feature is the dominant and pe-
culiar one of the society.   There are many foundling asylums
where dependent orphans of a limited class are cared for
and educated for lives of usefulness by those peculiarly in-
terested in them.   The poorhouses of the State afford some
sort of refuge to the utterly destitute, where the indigent,
improvident, and frequently worthless are kept.   Children
reared amid such conditions of inertness and squalor have
a poor chance, indeed, in life.   This society has conceived
a plan for taking these children who have this or no other
chance, who have no claims upon other institutions main-
tained by certain voluntary organizations, such as lodges
and churches, and to put them into homes that have no
children.   The world has had recently a most striking ex-
ample of the probable influence of a home life upon a child
taken from a public almshouse in Stanley, who gave the better
part of a continent to the world, and, what is more, brought
the possibilities of the world to a continent.   How much of
it he owed to the influences of the adopted home where his
attainments were gained, and where his character was cer-
tainly very largely influenced, if not formed, it may be im-
possible to say.   Judge Brewer, when a member of the Kansas
Supreme Court, in passing upon an application for a writ
of habeas corpus (*In re* Bullen, Petitioner, 28 Kan., 781),
where it was sought to take a young orphan girl from a
charitable institution, and to give her to her grandparent,
in an opinion replete with wisdom and goodness had this to
say:   "Two principal reasons control in my mind:   First.
Her life here would be a life in an institution; there, a

life in a home. I need not stop to recount the numberless blessings which home gives to a child, especially a female child. The common judgment of all voices the truth that the best development of a young life is within the sacred precincts of a home. No institution, however cultured and refined its instructors, however pure its life, however faithful and devoted all its officers and teachers to the care, nurture, and education of the many children within its walls, will give that sweet, gentle, and attractive development to a young girl that comes from the personal and affectionate training of a home. There is something of the same difference as between hotel life and a home life. There is more publicity to the one; more privacy to the other. There is something official, as it were, in one, and personal in the other." There can be no doubt that foundling institutions may be, and generally are, large blessings. But the belief voiced by the eminent judge quoted from in the advantages of home life as a beneficial influence in the formation of the most useful and independent characters may have had a place in the legislative mind. To accomplish such work, persons whose hearts are in it for simple charity's sake, not for the salary of a public office, are the best suited for it. May not the Legislature avail itself of the offer and services of such persons in doing what it unquestionably has the right to do by State officers—to care for the helpless and destitute children of the State?

But it is argued that, as the State does not appoint these officers, and can not remove them for misfeasance or malfeasance, and can not, therefore, control the application of the money appropriated, it amounts, after all, to the giving of that much money to the society. Without admitting the premise assumed, we turn to the investigation of the question whether the State has made such an unconditional ap-

propriation. The proviso attached to the appropriation reads as follows: "Provided, no part of said appropriations shall be paid until there has been executed on the part of said society, a bond to the Commonwealth of Kentucky, with good and sufficient security, stipulating and providing that all of said sums of money so appropriated shall be applied to the purposes of the charter of said society, that is, to the care, support and maintenance of homeless and destitute children in this Commonwealth, and providing homes for same, and a failure to do so to be a forfeiture thereof. Said bond to be approved by the Auditor of Public Accounts, and kept as a record in his office. If any part of said appropriation be not so applied then all of such part thereof as may be unexpended shall be returned to and covered into the State treasury. Said society shall, by its proper officers, make an annual verified statement and settlement with the Auditor of Public Accounts, showing when, where and how said funds or appropriations have been applied and disbursed." From the foregoing it is seen that the State has taken the precaution to insure that every dollar of its appropriation is expended directly for the benefit of homeless and destitute children of this Commonwealth. The requiring of the report under oath of the officials of the home to the Auditor of Public Accounts reserves to the State the power of enforcing the proper application of its appropriation—the power of visitation, a power which in this country is by the government itself, through the medium of courts of justice. 2 Kent, 240. The language of the act also disposes of the argument that the money of the State will be applied to objects of charity having no direct claim upon the State, a fear born of a statement in appellee's charter to this effect: "This corporation may adopt by-laws not inconsistent with the laws of Kentucky and these articles of in-

corporation, and in harmony with the constitution and by-laws of the Children's Home Society (National)." · We read this provision to mean that the general scope and plan of operation by appellee within its chosen field, Kentucky, is to be formulated after a plan for placing homeless children in childless homes in use in a National Children's Home Society, not that the children of the National Home Society can have any part of Kentucky's provision for her own destitute children. The very language of the act precludes the imagined danger, because it says the by-laws must not be in conflict with the laws of Kentucky. This act restricts the appropriation made by it to the use of Kentucky children, and compels all money not so used to be covered into the State treasury. Besides, section 331c, Ky. St., 1903, makes it unlawful for any person to bring into this Commonwealth destitute children, except they be his own, or nearly related to him, and with the intention of taking them into his own family. The act is not open to the objection that it is local or special legislation, prohibited by the Constitution, section 59. It is an act for the benefit of the homeless destitute children of this Commonwealth generally. It selects one agency to apply the money so appropriated, which, from the nature of the case, calls for an act of appropriation applicable to it alone. This is allowed by subsection 29 of section 59, Const. All appropriations must be made by the Legislature. Sections 230 and 58, Const. Therefore an act of this character was the appropriate method of making this appropriation. Nor does this appropriation create an indebtedness against the Commonwealth. It may be discontinued, reduced, or changed at the pleasure of the Legislature, which could not be done if it were a debt. It is a gratuity, just as the present provision for the support of the insane and idiots is, which may be altered both as to the amount

and manner of application at the pleasure of the lawmaking body.

We find nothing in the act violative of the Constitution. Its subject is one wholly within the sound discretion of the Legislature. That its exercise may be abused is true of this act, as well as of many other matters committed by the Constitution to that branch of government. But even its abuse is not a matter for the courts to inquire into. The people, alone can control that. They have reserved to themselves that power over their representatives in matters of legislation.

The judgment of the circuit court having been in conformity to these views, it is affirmed.