NEW JERSEY MORTGAGE FINANCE AGENCY AND JAMES C. BRADY, JR., COMMISSIONER OF BANKING, PLAINTIFFS-RESPONDENTS, v. JOSEPH M. McCRANE, JR., TREASURER OF THE STATE OF NEW JERSEY, DEFENDANT-APPELLANT.

Argued June 16, 1970—Decided July 6, 1970.

⚷84

*Mr. William Miller* argued the cause for defendant-appellant (*Mr. Allen D. Porter* of counsel and on the brief).

*Mr. Stephen G. Weiss,* Assistant Attorney General, argued the cause for plaintiffs-respondents (*Mr. George F. Kugler, Jr.,* Attorney General of New Jersey, attorney; *Mr. Stephen G. Weiss,* Assistant Attorney General, and *Mr. Arthur Abba Goldberg,* Deputy Attorney General, on the brief).

The opinion of the court was delivered by

PROCTOR, J. Plaintiffs, New Jersey Mortgage Finance Agency and James C. Brady, Jr., The Commissioner of Banking (hereinafter Agency) brought this action to obtain a declaratory judgment (*N. J. S. A.* 2A:16–50 *et seq.*) that the New Jersey Mortgage Finance Agency Law (herein-

after Law), *L.* 1970, *c.* 38, *N. J. S. A.* 17:1B–4 *et seq.*, is valid and constitutional. The action was filed after the defendant State Treasurer refused to lend money authorized by the Law for the use of the Agency. The Treasurer's refusal was based on his doubts of the Law's constitutionality. The case was tried on stipulated facts, and on cross motions for summary judgment the Law Division held for the plaintiffs. We certified the defendant's appeal directly to this Court. *R.* 2:12–1.

The Law was signed into law by Governor Cahill on May 4, 1970, and is the result of the Legislature's determination that New Jersey is experiencing a severe shortage of housing and a decline in "housing starts" caused in large part by "the lack of funds available to finance housing by the private mortgage lending institutions." *N. J. S. A.* 17:1B–5. In order to channel additional funds into the mortgage market, the Legislature established the Agency and empowered it to raise funds from private investors through the sale of tax exempt bond issues. These funds are then to be made available to private lending institutions for residential mortgage loans.

The Agency is a public corporation organized under the Department of Banking. *N. J. S. A.* 17:1B–7(a). Its members include the Commissioner of Banking, the Commissioner of Community Affairs, the State Treasurer, and two persons to be appointed by the Governor with the advice and consent of the Senate. *N. J. S. A.* 17:1B–7(b). The Law designates the Commissioner of Banking as the Chief Executive Officer. *N. J. S. A.* 17:1B–7(d). The Agency is authorized to sue and be sued, to make and alter bylaws for its internal organization and management, to make rules and regulations for the conduct of its business, to borrow money and to issue negotiable bonds or notes and to provide for and secure the payment thereof, to make loans to mortgage lenders for the making of new residential mortgages, and to take all necessary steps to carry out the purpose of the Law. *N. J. S. A.* 17:1B–8.

Rules and regulations made by the Agency "shall be designed to effectuate the general purposes of this act and the following specific objectives:

(i) the expansion of the supply of funds in the State available for new residential mortgages; (ii) the provision of the additional housing needed to remedy the shortage of adequate housing in the State and eliminate the existence of a large number of substandard dwellings; and (iii) the effective participation by mortgage lenders in the program authorized by the act and the restriction of the financial return and benefit thereto from such program to that necessary and reasonable to induce such participation." *N. J. S. A.* 17:1B-9(b)(7).

The Legislature appropriated to the account of the Agency the sum of $200,000 designed to defray initial expenses. *L. 1970, c. 38, § 23.* The Agency was obligated to reimburse the State Treasurer from the proceeds of bond sales within a period of five years. *Id.* Pursuant to this section, The Commissioner of Banking certified to the State Treasurer that the sum of $100,000 was required by the Agency in order to commence preliminary operations. The treasurer refused to release the funds for the reasons previously expressed, and the present suit resulted.

In his answer to plaintiffs' complaint, the Treasurer set up separate defenses contending: 1) that the case is not justiciable; 2) that the law does not meet the constitutional requirement of fulfilling a public purpose; 3) that even if the Law meets a public purpose, the means employed to carry out the purpose require a declaration of invalidity; 4) that the title of the Law fails to comply with constitutional requirements; and 5) that the Law constitutes an invalid delegation of legislative power to the Agency. We shall consider these questions in the order presented.

Defendant urges that the case is not justiciable since the suit is essentially a friendly one in which he has a mere difference of legal opinion with the plaintiffs. We cannot accept the argument. The suit, of course, does not

seek an advisory opinion upon some hypothetical matter. A statute does exist and the defendant has refused to comply with it because of doubts he asserts. Specifically, he has refused to make available to the Agency funds already appropriated by the Legislature, and the Agency cannot function without these funds. Such a refusal constitutes the basis of a true controversy. Moreover, the policy behind refusing to entertain suits where the parties do not stand in truly adversary positions is not threatened in this case. That policy is to avoid rendering decisions where it is unlikely that both sides will receive adequate representation before a court. In the present case special counsel was appointed for the defendant pursuant to *N. J. S. A.* 2A:1–10 which provides:

"In any action involving the constitutionality or validity of a statute providing for the expenditure of public moneys by the State or any instrumentality thereof where the legal issues concerning the constitutionality or validity thereof are genuine and a question arises as to whether the interests of the parties may not be truly adversary, and the issues are of public importance and an adjudication thereof is in the public interest, the Chief Justice of the Supreme Court, or the Supreme Court en banc, may appoint counsel specially to represent any party or interest as may be deemed necessary and appropriate to assure the full presentation of adversary positions and interests with respect to the issues."

This statute insures that both sides will receive adequate representation and, more importantly, that the public interest will be protected. And there is no question but that this case is precisely what was contemplated by the statute. The "issues are of public importance and an adjudication is in the public interest." We cannot be blind to the realities of government and commercial enterprise. Private lenders will not participate in this program until its constitutionality is adjudicated. There is no purpose in delaying adjudication which is inevitable where all interests are adequately represented. Only the public will suffer from a delay. More-

over, this kind of case has been entertained by our courts before. *E. g., Clayton v. Kervick,* 52 *N. J.* 138 (1968). In short, there is no doubt that this case presents a justiciable controversy.

The main thrust of defendant's arguments on the merits is that the Law does not sponsor a valid public purpose since it provides for the appropriation of public funds for private purposes in violation of *Art.* VIII § III, *par.* 3 of the New Jersey Constitution. He urges that "aid for the housing problems of the public generally, unrelated to any particular social evil" is not a valid public purpose. We disagree. The concept of "public purpose" is broad and is merely a reflection of the changing needs of society. As the needs change, the area of permissible governmental activity must change to meet those needs. *Roe v. Kervick,* 42 *N. J.* 191, 207 (1964). For it is elementary that the very purpose of government is to provide for the health, safety and general welfare of the people. When a particular condition arises which poses a threat to the fulfillment of that function, the government has the power to take whatever steps are necessary to check the threat subject only to applicable constitutional limitations. *Id.* at 212.

The question of whether a citizenry has adequate and sufficient housing is certainly one of the prime considerations in assessing the general health and welfare of that body. See, *e. g., Romano v. Housing Authority of Newark,* 123 *N. J. L.* 428 (Sup. Ct. 1939), *aff'd* 124 *N. J. L.* 452 (E. & A. 1940) ; *Ryan v. Housing Authority of Newark,* 125 *N. J. L.* 336, 340 (Sup. Ct. 1940) ; *Redfern v. Bd. of Com'rs of Jersey City,* 137 *N. J. L.* 356 (E. & A. 1948). In the present case, the Legislature made a determination that there was "a critical shortage of adequate housing," that "a large and significant number of New Jersey residents have and will be subject to hardship in finding adequate, safe and sanitary housing unless new facilities are constructed," and that "a major cause of this housing crisis is the lack of funds available to finance housing by the private mortgage lending

institutions of the State."[1] There is no doubt that the "crisis" referred to by the Legislature exists. Indeed, defendant does not deny it. Exhibits jointly stipulated to by the parties indicate that the present housing production rate of about 47,500 new dwelling units per year must be more than doubled if the State's housing needs are to be met. The state-wide vacancy rate has dropped to an estimated 1.1% with some northern cities well below the 1% mark even with substandard housing included in the estimates. The minimum acceptable rate is said to be 3% with a range of 4% to 6% "healthy." Housing choice is virtually non-existent at rates below 2%. See *Housing Crisis In New Jersey*, 1970, a report prepared by the Bureau of Community Development Planning in the Department of Community Affiairs. In these circumstances a program designed to increase housing production clearly satisfies the constitutional requirement of fostering a valid public purpose.

---

[1]"The legislature hereby finds: that the drastic decline in new housing starts, together with the existing large number of substandard dwellings, has produced a critical shortage of adequate housing in this state adversely affecting the economy of this state and the well-being of its residents; that there exists a need for adequate, safe and sanitary housing for New Jersey's residents; that a large and significant number of New Jersey residents have and will be subject to hardship in finding adequate, safe and sanitary housing unless new facilities are constructed and existing housing, where appropriate, is rehabilitated; that unless the supply of housing and the ability of our residents to obtain mortgage financing is increased significantly and expeditiously, a large number of residents of this state will be compelled to live in unsanitary, overcrowded and unsafe conditions to the detriment of the health, welfare and well-being of these persons and of the whole community of which they are a part; that by increasing the housing supply of this state and the ability of our residents to obtain mortgage financing, the clearance, replanning, development and redevelopment of blighted areas will be aided, and the critical shortage of adequate housing will be ameliorated.

"It is hereby found that a major cause of this housing crisis is the lack of funds available to finance housing by the private mortgage lending institutions of the state; it is further found that this lack of funds has frustrated the sale and purchase of existing residences in the state.

■■ Nor do we find any merit to defendant's contention that the Law is not designed to fulfill its stated purpose "in view of all the influences on the housing market," and the numerous state and federal programs already under way. It is obvious that the existing programs have not been adequate to meet the State's needs, and there is no reason why the Legislature may not take additional measures to meet these needs. See *Walker v. Alaska State Mortgage Association,* 416 *P.* 2d 245 (Sup. Ct. Alaska 1966). And even though the causes of the current crisis are complex, there is no reason why the Legislature cannot address itself to one of the causes, *i. e.,* the tightening of the mortgage market. *Cf. David v. Vesta Co.,* 45 *N. J.* 301 (1965). In any case, we believe the purpose is valid, and we will not second-guess the Legislature when "reasonable men might differ as to whether the means devised to meet the public need conform to the Constitution * * * [since] the means are presumptively valid * * *." *Roe v. Kervick, supra* 42 *N. J.* at 229.

---

"The legislature has determined that to aid in remedying these conditions, to promote the expansion of the supply of funds available for residential mortgages and thereby help alleviate the shortage of adequate housing, a corporate agency of the state shall be created with power to raise funds from private investors in order to make those funds available for residential mortgage loans in this state. The legislature has further determined that by utilizing such powers the agency created shall help develop the financial resources available to meet the housing needs of its residents. This purpose is best accomplished through a program whereby mortgage lending institutions make the needed residential mortgage loans through the use of pro- ceeds of loans made available by the agency on terms designed to assure the expansion of available mortgage funds while protecting against the realization by these mortgage lending institutions of an excessive financial return or benefit.

"The legislature further finds that the authority and powers conferred under this act and the expenditure of public moneys pursuant thereto constitutes a serving of a valid public purpose and that the enactment of the provisions hereinafter set forth is in the public interest and is hereby so declared to be such as a matter of express legislative determination."

■ Defendant next urges that even if the purpose of the Law is valid and the means are reasonably calculated to achieve that purpose, the Law is nevertheless unconstitutional since the means taken violate the prohibition against the lending of the State's credit. *Const.* 1947, *Art.* VIII, § 2, *par.* 1. This argument is based on the Law's financing procedures through revenue bonds issued by the Agency and payable solely out of the funds and revenues of the Agency. Defendant concedes that provisions of the Law which insulate the State from Agency obligations[2] are sufficient to assure that the obligations of the Agency are not debts of the State for purposes of *Article* VIII, § 2, *par.* 3. But he argues that the State is, in effect, pledging its credit in violation of *Article* VIII, § 2, *par.* 1 since the State's credit may be impaired if the Agency bonds go into default. The Constitution does not deal with this situation. It merely prohibits the State's credit from being "loaned." Bond financing by agencies has been upheld against this kind of attack before. *E. g., Clayton v. Kervick, supra* 52 *N. J.* at 155. See also *Roe v. Kervick, supra* 42 *N. J.* at 217 where we said:

---

[2] *N. J. S. A.* 17 :1B–10 (g) provides:

"Bonds and notes of the agency issued under the provisions of the act shall not be in any way a debt or liability of the State or of any political subdivision thereof other than the agency and shall not create or constitute any indebtedness, liability or obligation of the State or of any such political subdivision or be or constitute a pledge of the faith and credit of the state or of any such political subdivision but all such bonds and notes, unless funded or refunded by bonds or notes of the agency, shall be payable solely from revenues or funds pledged or available for their payment as authorized in the act. Each bond and note shall contain on its face a statement to the effect that the agency is obligated to pay the principal thereof or the interest thereon only from revenues or funds of the agency and that neither the State nor any political subdivision thereof is obligated to pay such principal or interest and that neither the faith and credit nor the taxing power of the state or any political subdivision thereof is pledged to the payment of the principal of or the interest on such bonds or notes."

"These considerations indicate that the prohibition against lending of credit or money does not mean that the State and its political subdivisions cannot buy and pay for what they need to achieve public purposes. Nor do they signify that governmental units cannot employ the services of a third person or corporation to do any lawful act which they have the right to have done, and to pay for it. *Cf. McNichols v. City and County of Denver, supra* [101 Colo. 316, 74 P. 2d 99] ; *Hager v. Kentucky Children's Home Soc., supra* [119 Ky. 235, 83 S. W. 605]. It seems to follow, therefore, that if the purpose of a statute be public, as it clearly is here, the means of accomplishing it laid down thereby ought to be regarded as a matter of valid legislative policy so long as the means are restricted to the public end by the legislation and contractual obligation."

Moreover, we believe the criteria laid down in *Roe* regarding the degree of control over the private instrumentality are satisfied. See 45 *N. J.* at 218. The Agency's relationship with the private lenders is contractual and the terms of the contracts must provide to the Agency substantial consideration other than the mere obligation to repay the money with interest. *N. J. S. A.* 17:1B–9(a) provides: "Loans to mortgage lenders, rules and regulations; objectives. (a) The agency shall from time to time make loans to mortgage lenders so as to furnish, as rapidly as possible, funds to mortgage lenders for new residential mortgages." *N. J. S. A.* 17:1B–9(g) provides: "The agency shall require the submission to it by each mortgage lender to which the agency has made a loan of evidence satisfactory to the agency of the making of new residential mortgages as required by this section and prescribed by rules and regulations of the agency and in connection therewith may inspect the books and records of such mortgage lender." Thus, the participating private lenders are more than mere borrowers; they become agencies which are required to implement the public purpose of the Law, *i. e.,* to issue new residential mortgages. Finally, any private gains by the mortgagees are merely incidental to the achievement of that purpose. Such incidental private benefit is permissible under our cases. *E. g., Roe v. Kervick, supra* 42 *N. J.* at 223–226 and cases cited therein.

■ Defendant's next contention is that the Law's title violates *Article IV, § 7, par. 4* of the New Jersey Constitution which provides in pertinent part:

"To avoid improper influences which may result from intermixing in one and the same act such things as have no proper relation to each other, every law shall embrace but one object, and that shall be expressed in the title."

The title of the Law reads:

"AN ACT to increase available funds for residential mortgage loans in the State; creating the New Jersey Mortgage Finance Agency and defining its powers and duties; authorizing loans by the agency to mortgage lenders to furnish funds for new residential mortgage loans; authorizing the issuance of bonds and notes of the agency and providing the terms and security thereof; and making an appropriation therefor."

Defendant concedes that this title expresses only one purpose, *viz.,* increasing the availability of funds for new residential mortgage loans. But he nonetheless urges that the Law's reference to aid in the "clearance, development and redevelopment of blighted areas," *N. J. S. A.* 17:1B-5, and the elimination of substandard housing, *N. J. S. A.* 17:1B-9(b)(7)(ii), do not appear in the title. It is clear that the subjects of blighted areas and substandard housing are intimately connected with the current housing crisis to which the Law is addressed. The title of a law is only a general statement of purpose and not an index to its provisions. We are satisfied that the title here provided adequate notice of the Law's purpose to members of the Legislature and to the public. *Kline v. N. J. Racing Commission,* 38 *N. J.* 109, 117 (1962); *State v. Zelinski,* 33 *N. J.* 561, 565 (1960). *See also Howard Savings Institution v. Kielb,* 38 *N. J.* 186, 200 (1962); *Wilson v. City of Long Branch,* 27 *N. J.* 360, 373 (1958), *cert. denied* 358 *U. S.* 873, 79 *S. Ct.* 113, 3 *L. Ed.* 2d 104 (1958); *Robson v. Rodriquez,* 26 *N. J.* 517, 527 (1958).

Finally, defendant urges that the Law constitutes an invalid delegation of legislative power to the Agency. Of course, the Legislature may not vest unbridled or arbitrary power in an administrative agency. *N. J. Bell Tel. Co. v. Communications Workers, etc.,* 5 *N. J.* 354, 370 (1950); *State v. Wheeler Auto Driving School, Inc.,* 17 *N. J. Super.* 488, 495 (App. Div. 1952). But the necessities of modern government have increasingly dictated the use of general rather than minutely detailed standards in regulatory enactments under the police power. *Ward v. Scott,* 11 *N. J.* 117, 123–124 (1952). *See also Shelton College v. State Board of Ed.,* 48 *N. J.* 501, 516–519 (1967); *Wilson v. City of Long Branch, supra* 27 *N. J.* at 378–379 (1958); *Sayreville v. Pennsylvania R. R.,* 26 *N. J.* 197 (1958); *In re Berardi,* 23 *N. J.* 485 (1957). We believe that the Law here sufficiently spells out the operations of the Agency to pass constitutional muster.

In *N. J. S. A.* 17:1B–5, the Legislature stated that the purpose of the Law was "To promote the expansion of the supply of funds available for residential mortgages * * * on terms designed to assure the expansion of available mortgage funds while protecting against the realization by these mortgage lending institutions of an excessive financial return or benefit." In *N. J. S. A.* 17:1B–8, the Legislature has defined the powers of the Agency. These include, *inter alia,* the power "To make loans to mortgage lenders under terms and conditions requiring the proceeds thereof to be used by such mortgage lenders for the making of new residential mortgages, all subject to the provisions of section 6 [17:1B–9] of the act." This latter section [17:1B–9] indicates that the objective of the Law is the issuance of new residential mortgages as rapidly as possible. It then enumerates in some detail the areas to which rules and regulations should be addressed, *e. g.,* limitations regarding the number of family units, location or other characteristics of residences to be financed; restrictions regarding interest rates; requirements regarding commitments

by mortgage lenders with respect to new residential mortgages. Also included is a mandate that the Agency require evidence from lenders of the making of new residential mortgages. *N. J. S. A.* 17:1B–9(g).

There are numerous other provisions which we need not detail here. We believe that the Agency has been given sufficient guidelines for it to intelligenlty implement the legislative purpose, and there is no reason for us to assume that, in doing so, it will act arbitrarily. Defendant argues that there is nothing in the law to prevent the private lending institutions from distributing mortgages financed through the Agency ˙solely to persons of great affluence. We must assume that, in its expertise, the Agency will see to it that the loans are so distributed as to meet the housing shortage with which the Legislature is concerned.

For the reasons stated above, the judgment of the trial court is affirmed.

*For affirmance*—Chief Justice WEINTRAUB and Justices JACOBS, FRANCIS, PROCTOR, HALL, SCHETTINO and HANEMAN—7.

*For reversal*—None.