LESLIE H. JAMOUNEAU, A CITIZEN AND TAXPAYER OF THE CITY OF NEWARK, APPELLANT, v. LOCAL GOVERNMENT BOARD OF THE DIVISION OF LOCAL GOVERNMENT IN THE STATE DEPARTMENT OF TAXATION AND FINANCE OF THE STATE OF NEW JERSEY, CITY OF NEWARK, A MUNICIPAL CORPORATION OF THE COUNTY OF ESSEX AND STATE OF NEW JERSEY, AND RAYMOND COMMERCE CORPORATION, RESPONDENTS.

Argued January 8, 1951—Decided February 5, 1951.

284

*Mr. Saul A. Wittes* argued the cause for appellant.

*Mr. Charles Handler* argued the cause for respondent City of Newark. *Mr. Vincent J. Casale* on the brief.

*Mr. Robert L. Hood* argued the cause for respondent Raymond Commerce Corporation.

*Mr. Theodore D. Parsons,* Attorney General, argued the cause for respondent Local Government Board. *Mr. Thomas P. Cook,* Deputy Attorney General, on the brief.

The opinion of the court was delivered by

CASE, J. On December 31, 1928, the City of Newark was the owner of vacant land at Commerce Street and Raymond Boulevard in that city. It leased the land to Abraham E. Lefcourt for a term of 50 years, commencing January 1, 1929, at a minimum annual rental of $75,000 until the final five-year period and of $95,000 during that period. There was a provision, based upon recurring land appraisals, by which the rental could be raised, but not lowered, during the last 30 years of the term. The lessee was obliged to construct forthwith a fireproof building, at least 20 stories in height, of the value of approximately $3,500,000 and to "uphold, maintain and keep the building in good and satisfactory condition and repair." He was obligated to make repairs and replacements and to keep the building and its appurtenances in good repair and operating condition in manner more particularly hereinafter mentioned. The lease provided that the building, when erected upon the demised premises, should be deemed to be attached to the freehold and, at the end or other expiration of the lease, should remain upon and be surrendered with the premises as a part thereof and that on the last day of the term, or other sooner determination of the estate granted, the demised premises, together with the buildings thereon and the fixtures appurtenant thereto, would be surrendered and yielded up to the lessor and that the lessee would pay as so much additional rent all taxes upon the buildings and improvements upon said property, and all payments, extraordinary as well as ordinary, which should or might be levied or imposed or become a lien upon said real estate and upon any and all buildings and improvements thereon or to be erected thereon, and upon the leasehold estate, "excepting taxes on the ground," and, further, that a default by the lessee in any of his undertakings would, at the option of the lessor, terminate the lease and authorize the lessor to enter upon the

premises, the buildings and the improvements thereon, and to take full possession thereof and be vested therewith. There was also a provision that the lessor would not mortgage the fee of the premises during the term of the lease and that the lessee could not mortgage the fee but could mortgage the building, fixtures, equipment and contents and also the leasehold estate. When the negotiations for the present sale were under way, the lessee suggested that the mortgage which was placed upon the building is still unpaid and that the lien thereof would be superior to any interest the city might have. That contention is mentioned but not argued before us, and we shall presently state our assumption that the rights of the mortgagee are subordinate to those of the lessor.

A 34-story office building was erected upon the premises. So far as the records disclose, there have been no defaults and the estimates of value are all upon the assumption that there will be none. The Raymond Commerce Corporation is the successor in interest to the original lessee and is the present lessee.

Raymond Commerce Corporation made overtures to the city looking toward the purchase of the land and the cancellation of the lease. Two appraisals of value were obtained by the lessee, respectively $639,884 and $700,000, and two were obtained by the city, respectively $873,129 and $837,644. Thereupon the city, on November 28, 1949, passed a resolution reviewing some of the provisions of the lease, reciting difficulties encountered by the lessee in obtaining satisfactory financing, stating that the lessee was willing to take over ownership and to do all things required to improve and maintain the premises so as to maintain its present tax value and thereby to increase the tax revenue over the years and that the lessee offered to pay $400,000 for the fee of the land and $350,000 for the cancellation of the lease, a total of $750,000, referring to the real estate appraisals in the amounts above mentioned, alluding to the sum of annual taxes on the land which would accrue to the municipality and the "overall consideration," finding that it was for the best interest of the city to have the ownership consolidated and to sell the fee and the city's

interest at private sale to the lessee for the sum offered in accordance with the provisions of paragraph (d) of section 40:60–26 of our Revised Statutes, concluding that the merger of title to land and building in one ownership would enhance the total assessable value of the land and building, and direct-ing the sale accordingly, subject to and contingent upon the approval of the Director of the Division of Local Government in the State Department of Taxation and Finance (*R. S.* 40:60–26(d), *supra*). The matter was reported to and ap-proved by the Director of the Division of Local Government. That action, appealed by Leslie H. Jamouneau, a citizen and taxpayer of the City of Newark, was affirmed by the Local Government Board. The appeal from the Board to the Appel-late Division has been certified to us on our own motion.

 *R. S.* 40:60–26 sets up four methods by which the governing body of a municipality may sell lands, buildings or interests therein, not needed for public use. The fourth· method, contained in paragraph (d) and the one here pur-sued, is distinguished by the requirement that the terms and conditions of sale be approved in writing by the Director of the Division of Local Government in the State Department of Taxation and Finance. That approval is a *sine qua non* in the procedure, yet the statute suggests·no conditions upon which the approval shall be granted or withheld and pro-nounces no standard upon which the official action shall move. The officer in question, as his title indicates, is part of a state administrative agency. He is not a part of the local govern-ment; his authority is statewide, but he is given an absolute and unlimited discretion to authenticate or disqualify an act of strictly local significance, controlled by no rule, and upon no principle or terms of expediency declared by the Legisla-ture. The authority may not be rested upon the broad powers given municipalities over their own acts because the officer is not a part of the local administration. It may not obtain validity as a delegated legislative authority because the Legis-lature has indicated no norm upon which the determination is to depend. *Van Riper v. Traffic Telephone Workers' Fed-eration of New Jersey,* 2 *N. J.* 335 (1949); *Gilhooly v. City*

*of Elizabeth,* 66 *N. J. L.* 484 (*Sup. Ct.* 1901). The argument advanced in support of the legality of the power is, in effect, that the director is to check upon the provisions of the law, whether in statute or in Constitution, concerning the authority of the city to make the sale, upon the sufficiency of the findings of the city governing body and upon the general wisdom of the transaction with respect to the city finances; all of which is but to point toward various considerations which could have been set up as standards to control the officer in the exercise of his power, but were not. The attempted delegation of power to the Director is void in that it goes beyond the legitimate bounds of delegation of legislative power. That fault is an inseparable part of section (d) upon which the authority for the sale depends. The determination appealed from and the municipal action must, therefore, be set aside because of that fundamental defect in the statutory proceeding.

Since the matter may again become a matter of negotiation we express our view that the reasons upon which the consideration passing to the city was calculated are a confusion of sound and unsound assumptions.

One of the "whereas" clauses in the city resolution recites that the lessee is unable to obtain the long term financing necessary for "required improvements and high standard of repair and maintenance of the premises," wherefore the structure is rapidly depreciating through wear and tear as well as obsolescence. That statement inextricably mingles the burdens which the tenant must, by the terms of the lease, carry, or, on failure, submit to a default, with those which are not made a condition of the lease, and it is emphasized by the conclusion expressed in a later paragraph of the resolution that there was an "overall consideration" in the situation "relating to the premises itself in the light of depreciation and obsolescence thereof over the past years and the ensuing years, and the consequences thereof, together with the advantage of consolidated ownership so as to conveniently finance improvements and the continuous high maintenance of repair and management; and it (*viz.,* the city) has arrived at the

conclusion that it will be more advantageous to consolidate the ownership * * *." If by "improvements" are meant betterments or modernizations, the making of them is not required unless as a part of an assessment for local municipal improvement or demanded by law, ordinance or police regulation. But the lease provides:

"14. And the said Lessee further covenants and agrees that he will, during the continuance of this lease, at his own cost and expense, uphold, maintain and keep in good and satisfactory condition and repair the building on said premises and will make any and all repairs to the building, exterior and interior, including repairs and re placements to the plumbing and sewage system, elevators and heating apparatus and equipment, and repairs to the roofs, chimneys and walls of said building, and the sidewalks and curbs adjacent to the said premises, together with the coal holes and covers and other openings on the streets adjoining said building or buildings, and that the said Lessor, its successors and assigns, is not to be responsible for, or chargeable, with any repairs to said premises, both inside and outside, or to the equipment therein.

"15. And the said Lessee further covenants and agrees that he will maintain and keep said building and all the fixtures, equipment and appurtenances in good repair and in good operating condition at his own cost and risk, and if he should fail to maintain and keep the buildings erected on said premises, or the equipment therein contained, in good order and repair during the said term, the said Lessor, its successors and assigns, after giving thirty (30) days' notice by registered mail to said Lessee may do and perform all the repairs which may be necessary in and about the said building, fixtures and equipment, and add the cost of such repairs to the rent due hereunder on the first day of the next succeeding month."

A default in those, as in other, obligations gives the lessor the right, at its option and after notice, to take over the premises and terminate all right, title and interest of the lessee. It is quite beside the point to argue that if the lessee cannot operate the building to financial advantage the lessor would not be able to do so. The lessee must meet the interest and amortization charges of the mortgage. The mortgagee is not a party to this proceeding, and no adjudication may be made against it here; but we are obliged to view the obligation of the mortgage in its bearing upon the rights and duties between the lessor and lessee, *inter sese,* in so far as the pending transac-

tion is concerned, the more so because the city, in its authorizing resolution, recites that the "tenant has the right to mortgage the building" and does so in a way that creates doubt as to whether or not this recital carried weight in the decision to sell. The lease provides in paragraph 34 that if the mortgagee shall, within 60 days after receiving notice of a termination of the lease or re-entry by the lessor, pay to the lessor all the sums then due under the lease, the lessor will execute and deliver to the mortgagee or his designee a new lease of the demised premises to run until December 31, 1978, with equivalent terms and conditions. The mortgagee, therefore, has the right, in the event of a re-entry by the landlord, on conditions, to be subrogated as a lessee, but otherwise we take it that the wiping out of the lessee's rights would also erase those of the mortgagee. Therefore the suggestion that the mortgage is a lien on the building superior to the interest of the city and will survive the expiration of the leasehold is not well made, and the further suggestion that unless consolidation of title is effected the lessee and mortgagee will permit the building to fall into obsolescence in the effort to make some return out of the enterprise and that such a consolidation must be had if those interests are to make "continued improvement and repair" must be taken either to relate only to such betterments as are not properly within the lessee's obligation to repair and replace or as a threat to submit to a default with consequent penalties. At the time of the erection of the building the mortgage was of the amount of $2,600,000; it is said that interest has accumulated to the extent that the principal and interest now due on the mortgage exceed $3,000,000. It is apparent that if the management of the property were relieved of the tremendous burden of that mortgage the financial picture would greatly change; and it appears to us that, as we have said, a default in the performance by the lessee or by the mortgagee of the conditions of the lease will result in re-entry by the city freed of the mortgage obligation. Disappointing as has been the experience of the lessee and of the mortgagee in their financial return, the city is not justified in disposing of its moneys or its property by way of

gift to those interests in reduction of their losses. And inasmuch as the city is, by its right of re-entry and the acquisition of this $3,500,000 building, thoroughly protected against a default, we regard any concession, measured by dollars, made to the financial difficulties of the lessee as a contribution or gift and therefore within the constitutional inhibition. (*Constitution, Article VIII, Section III, paragraph 2.*)

A question is raised about liability for the payment of taxes on the land as distinguished from buildings and improvements. We construe the lease to mean that during the term thereof the lessee shall not be called upon to pay the land tax. The land is not in public use and therefore is taxable, *Jamouneau v. Division of Tax Appeals, 2 N. J.* 325 (1949), but the obligation upon the municipal owner to pay the land tax out of its land rental is not unreasonable, is not an excessive part of the receipts from the use of the land and, in our opinion, is not an unlawful incident. It is not, as appellant appears to contend, a grant of tax exemption. It is a retention of the tax obligation as a burden on the owner to be met from the annual rent charges and is not within the application of *Whipple v. Teaneck Township, 135 N. J. L.* 345 (*E. & A.* 1946). There is nothing novel about the obligation of a municipality to pay taxes on property owned by it and not devoted to a public use. *Newark v. Township of Clinton, 49 N. J. L.* 370 (*Sup. Ct.* 1887) ; *City of Perth Amboy v. Barker, 74 N. J. L.* 127 (*Sup. Ct.* 1906) ; *Essex Co. Park Commission v. State Board, 129 N. J. L.* 336 (*Sup. Ct.* 1943). To the extent that a yearly tax on the land would result in a reduced net income from rental, it lessens the worth of the lease as an asset to the city, and so is a proper factor in the computation.

The agreed price frankly includes no value for the building at the expiration of the lease period; it is taken for granted by the lessor and the lessee and their respective appraisers that the structure should then be written off as worthless. This position is difficult to understand in the absence of persuasive proof unless, indeed, we are to accept the reasoning, entirely erroneous in point of law in the disposition of public

property, expressed in the appraisal of one of the appraisers as follows:

"It seems unfair for the owners to be forced to pay again for a building which they originally paid for. This would actually occur if the structure were to be regarded as having value at the expiration of the lease.

"The City of Newark, by reason of an advantageous lease, has enjoyed the benefits of an exorbitant rental for its land during the past 16 years, and will presumably continue to enjoy such benefits for 30 years more. The surplus income received and to be received over what might be regarded as Fair Market Income, would represent, if compounded annually to the end of the lease, an amount in excess of the original building cost."

The structure is a 34-story fireproof office building in Newark's downtown business section. It carries a progressive ground rent. The lease will expire on January 1, 1979. On that date the building will be slightly less than 50 years old. Notwithstanding certain bookkeeping practices, governmentally approved, of depreciating structures so that their value shall be written off in a period of 50 years or less, it nevertheless does not comport with general knowledge that every building, no matter how substantial, will become of no value whatever at the end of such a period.

The table of comparative operating statements shows the years from 1932 to 1947 inclusive. From 1937 to 1947 inclusive the rent and miscellaneous income increased progressively each year from $310,229.66 in 1937 to $693,461.69 in 1947. The mortgage interest, having remained static from 1937 to 1941 at $132,300, dropped steadily to $114,781.96 in 1947. In 1947 the statement seems for the first time to be in the black, showing a net income of $25,687.57. So far as we can discover the property is in the period of its most prosperous operation. Nevertheless it is assumed that this massive structure will, in less than 30 years, notwithstanding the staggering increase since the building was constructed in the cost of materials and labor and the reasonable expectation that the increase in building costs has not yet reached its zenith, not be worth a dollar. We think that the compelling presumption is the other way, namely, that there will be sub-

stantial value at the end of the lease period, and that if the city's interest is to be sold upon the opposite hypothesis, there should be satisfactory evidence in support of that proposition.

It further appears in the city's authorizing resolution that an influencing factor was "the sum of the annual taxes on the land which will accrue to the municipality." If this be read with an earlier paragraph to mean that the making of anticipated improvements and a continuous high maintenance of repair and management, contrasted with depreciation and obsolescence, would result in increased annual taxes, it is pertinent to remark that the resolution imposes no such requirement and we find nothing otherwise that serves as an obligation upon the lessee to pursue that course (*cf. Anschelewitz v. Belmar,* 2 *N. J.* 178, 182 (1949)). Whether that was the idea or the reference was strictly to prospective taxes on the land itself, we are referred to no authority in the law whereby a municipality is authorized to sell property for less than value upon the consideration that the tax return will thereby be increased. The real question, therefore, is whether the city is receiving a fair value for what it conveys.

As has been said, none of the estimates of value accepted by the city is on the assumption that there will be a default; and if there should be a default that contingency would be met as we have indicated. The problem, therefore, does not come within the scope of a doubtful claim upon which the city strives to realize.

█ The price of $750,000 is not the result reached by any of the appraisers. It is $123,000 less than the estimate of one of the city appraisers and $87,000 less than the estimate of the other city appraiser and is slightly less than the average of the four estimates. Therefore no set of figures leads logically to the determined price. It is argued, however, that $750,000 paid now will, because the city has the money in hand, be worth the $2,350,000 minimum rentals that would come in through the remaining 30 years of the term plus the $400,000 representing the land value 20 years hence. That reasoning, as it seems to us, is specious. In endeavoring to determine a present sum which, at a fixed rate of interest

compounded annually, would produce the equivalent of the values ultimately coming to the city under the lease, the appraisers variously calculated that a sum in hand would be worth interest rates ranging from 4½% to 7% per annum— the average was 5.193%—and so arrived at their several conclusions. A vital element in such a computation is the annual value of money to the city, and we are clearly of the mind that the applied rates were much too high. With the lowering of money value, that is to say, a lowering of the amount which the city may earn with its money or which it will be obliged to pay for the use of money, the estimates of present value of future moneys, whether rental or otherwise, must rise proportionately because it will take more money in hand to produce those future values. Municipal financing under existing and foreseeable conditions produces cheap money. Without going into a nicety of rates, it is in proof that the City of Newark may borrow at an interest charge not in excess of 2½% per annum. It could borrow $750,000 at an annual interest charge of $18,750. If we assume that an annual tax or the equivalent thereof is to be made a charge against the recurring rent receipts, we may take a constant assessment value for the land of $400,000 and a tax rate, also constant, of 7%, both of which seem to be ample (the present tax rate is said to be 6.50%), and so obtain an annual tax charge of $28,000. Thus the interest and tax charges every year against the current rental would amount to $46,750. The annual rental until the final five-year period would exceed those charges by $28,250 and during the final five years by $33,250. The excess of rentals over charges during 30 years would gross $872,500. Without going into the further asset value to the city of having the use of those surplus moneys during the years of the lease term, much less into the compounding of that value from year to year, the city, at the end of the lease term, would have accumulated funds with which to pay the principal amount of $750,000 with $122,500 left over. In addition, it would have the land, valued at $400,000, and the building for whatever the latter might be worth. We are aware that the lease does not permit the city to mortgage the

property in question, and our reasoning is not based upon any other assumption; but we have said enough to indicate the significance of money in hand by the city measured in terms of annual interest rates and enough, we think, to demonstrate that the formulas used in arriving at the present value of the future city income, in order to support the logic of a $750,000 sale price, were not, in that important respect, realistic. What the city has to pay for money seems to be a fair measure of what money in hand is worth to it by way of earning power. Discount charges and interest charges are related items. The city may not give away revenues not yet accrued any more than it may give away revenues now due. *Jersey City v. North Jersey Street Ry. Co.*, 78 *N. J. L.* 72 (*Sup. Ct.* 1909). When we say "give away" we refer to the legal conception of a clear and substantial deficiency in consideration for giving up a source of city revenue, even though the deficiency may not have been perceived by the city when the authorizing resolution was adopted and became demonstrated only on the review.

We conclude that, on the case before us, a fair consideration does not pass to the city for the property sold and the rights surrendered.

For the reasons first stated the determination below will be reversed and the resolution under review will be set aside. Costs are allowed to the appellant against the City of Newark.

*For reversal*—Chief Justice VANDERBILT, and Justices CASE, OLIPHANT, BURLING and ACKERSON—5.

*For affirmance*—Justice WACHENFELD—1.