919 A.2d 170

NEW JERSEY CITIZEN ACTION, INC., A NEW JERSEY CORPORATION, REGINA O'NEILL, JULIE OTTO, AND MARY ANN MILLIGAN, PLAINTIFFS–APPELLANTS, v. COUNTY OF BERGEN, BERGEN COUNTY IMPROVEMENT AUTHORITY, SOLOMON HEALTH MANAGEMENT, LLC, A LIMITED LIABILITY COMPANY OF THE STATE OF COLORADO, INDIVIDUALLY AND D/B/A SOLOMON HEALTH SERVICES, LLC AND D/B/A SOLOMON HEALTH GROUP, LLC; V. ROBERT SALAZAR; HERSCH KRAUSZ; DAVID SEBBAG; SOLOMON HEALTHCARE GROUP, LLC, A LIMITED LIABILITY COMPANY OF THE STATE OF NEW JERSEY; BERGEN REGIONAL MEDICAL CENTER, LP, A LIMITED PARTNERSHIP OF THE STATE OF NEW JERSEY; GLOBAL TPA, INC., FORMERLY KNOWN AS GLOBAL MANAGEMENT SERVICES, INC., A CORPORATION OF THE STATE OF COLORADO; GLOBAL ADVISORS, LLC, D/B/A GLOBAL MANAGEMENT SERVICES, INC., A LIMITED LIABILITY COMPANY OF THE STATE OF COLORADO; AND ICARE MANAGEMENT LLC, A LIMITED LIABILITY COMPANY OF THE STATE OF CONNECTICUT, DEFENDANTS–RESPONDENTS.

Superior Court of New Jersey
Appellate Division

Argued March 13, 2007—Decided April 9, 2007.

Before Judge COBURN, R.B. COLEMAN and GILROY.

*Leon B. Savetsky and Martin K. Brigham (Raynes McCarty )* of the Pennsylvania bar, admitted pro hac vice, argued the cause for appellants (*Loccke, Correia, Schlager, Limsky & Bukosky, and Robert F. Williams, and Mr. Brigham,* attorneys; *Mr. Savetsky and Mr. Williams,* of counsel and on the brief).

*James X. Sattely, Jr.,* argued the cause for respondent *Bergen County (Esther Suarez,* County Counsel, attorney; *Mr. Sattely,* of counsel and on the brief).

*Arthur M. Neiss* argued the cause for respondent *Bergen County Improvement Authority (Dennis J. Oury,* attorney; *Mr. Neiss,* of counsel and on the brief).

*James M. Hirschhorn* argued the cause for respondents *Solomon Health Management (Sills Cummis Epstein & Gross,* attorneys; *Mr. Hirschhorn,* of counsel and on the brief).

The opinion of the court was delivered by

COBURN, P.J.A.D.

Plaintiffs filed a declaratory judgment action in the Law Division challenging the validity of two loans made by defendant Bergen County Improvement Authority ("BCIA") to a private entity, defendant Solomon Health Group, LLC ("Solomon"). Plaintiffs' complaint alleges that the loans lacked consideration, or lacked adequate consideration, and were in any case not confined to the execution of any public purpose, thereby violating Article VIII, Section III, Paragraphs 2 and 3 of the New Jersey Constitution.

Defendants filed motions to dismiss the complaint for failure to state a cause of action, *R.* 4:6–2(e). The trial court granted the motions, and plaintiffs appeal. Although we express no view respecting the ultimate merits of plaintiffs' claim, we are satisfied that the complaint, viewed in the context of the contracts and other documents to which the complaint refers, states a cause of action for which relief can be granted. Therefore, we reverse and remand for further proceedings.

I

In 1997, Bergen County decided that the public would be better served if the Bergen Pines County Hospital, which it had owned and operated for about eighty years, was managed by a private entity. The hospital, a 1185-bed facility, is located in Paramus, and is now called the Bergen Regional Medical Center.

After seeking proposals from private, for-profit entities, the County decided to lease the hospital to defendant Solomon. Accordingly, on December 17, 1997, the County signed a written nineteen-year lease transferring the property and the license to operate the hospital to the BCIA, which, on the same date, signed a written lease, referred to by the parties as the LOA, transferring operation of the hospital to Solomon for nineteen years.

The LOA states that the term of the nineteen-year lease would begin on March 1, 1998, or on such other date as mutually agreed to by the parties. The BCIA is obligated to pay Solomon $9 million per month for management services, and Solomon is obligated to pay rent of $5.2 million per year to the BCIA. Generally speaking, Solomon is entitled to keep all profits generated by its management of the hospital, while being exposed to any losses if the expenses exceed the income generated by the management fee and receipts for services provided to patients.

The LOA recognizes that the County retains ownership of accounts receivable for services provided before the lease begins, and that Solomon is responsible for collecting those accounts receivable and turning them over to the BCIA for transfer to the County. Section 5.3 of the LOA allows Solomon to pledge the hospital's accounts receivable for "any line or letter of credit or other financing," while expressly stating that this right only extends to "amounts to be paid or received to the Manager with respect to Management Services provided by ... the Manager subsequent to the Lease Term Commencement Date." Section 5.1(f) of the LOA implies that Solomon will be permitted to retain and use all or some of the previously earned accounts receivable

that it collects for the County for some unstated time by these words:

> The amount (i) of Fixed Annual Rent payable to the BCIA by the Manager in any month ... and (ii) *payments that are required to be made during such month to provide for repayment by the Manager of moneys received from accounts receivable existing as of the day preceding the Lease Term Commencement Date, in accordance with the terms of a promissory note to be executed by the Manager setting forth, among other things, the amounts to be repaid and the date of repayment* ... shall be deducted from the Management fee payable hereunder on or prior to the twentieth (20th) day of such month.
> [Emphasis added.]

The complaint alleges that in its proposal Solomon warranted that it would be able to meet all of its financial obligations under the LOA from its own funds and further warranted in that regard that its owners had a combined personal net worth of over $50 million. Section 4.3 of the LOA provides further security, requiring Solomon to obtain a $10 million operating line of credit, on terms and from a financial institution acceptable to the BCIA, that is to remain in place for the entire lease term.

The complaint alleges that in the Spring of 1998, Solomon obtained from the BCIA "additional concessions" that were unsupported by any consideration. The complaint describes these concessions as two loans, a "Working Capital Loan" of $6 million and an "Accounts Receivable Loan" of $27 million. The complaint alleges that the cash flow from the management fee and patient services is sufficient for operation of the hospital and that the loans were not and are not needed for that purpose. These loans appear for the first time in a promissory note executed by Solomon on or about March 13, 1998.

From 1998 through March 14, 2006, the $6 million Working Capital Loan requires no repayment of principal and is interest free. Thereafter, the annual interest is fifty percent "of the increase (if any) in [an identified] Consumer Price Index." Principal payments of at least $500,000 per year do not begin until March 15, 2006, with the entire principal to be paid no later than March 14, 2012. The promissory note further states that the loan "shall be utilized by Solomon in its sole discretion for *or with*

*respect to* the provision of Management Services (as such term is defined in the Operating Agreement) at Bergen Regional Medical Center. . . ." (Emphasis added).

The Accounts Receivable Loan, which the parties estimated in the promissory note to be $15 million, but is now approximately $27 million, is also to be used by Solomon "in its sole discretion for *or with respect to* the provision of Management Services at Bergen Regional Medical Center." (Emphasis added). The loan bears no interest until March 14, 2014. Thereafter, the interest rate is to be calculated in the same way as required for the Working Capital Loan. The principal must be paid back on March 14, 2020, but no principal payments are required before that date, which is three years after the LOA expires. The complaint alleges that the County had to issue bonds bearing substantial interest to meet its obligations on the loans.

On March 13, 1998, the BCIA and Solomon executed another agreement supplementing the LOA. Although this agreement appears to have been executed at the same time as the promissory note, it makes no reference to the note or to the loans. It sets the commencement of the LOA as March 15, 1998, which was the date on which Solomon began operating the hospital. For present purposes, we will accept defendants' description of the benefits to the BCIA of the supplemental agreement:

> In its original form, the LOA provided that the management fee would be paid one half on the tenth of each month and one half on the twentieth. The First Supplement to the LOA . . . pushed back the payment date to the last business day of the month. It also strengthened the performance bond and letter of credit provisions that provide the BCIA with financial security for the Manager's performance, and it gave the BCIA the right to withhold and escrow part of the Management Fee if the Manager did not give financial security. In addition, the First Supplement gave the BCIA the right to review and approve all agreements between the Manager and health insurers.

The complaint alleges that the BCIA relinquished any right it might have had to control the use of the loan proceeds, that Solomon's subsequent financial statements fail to mention the loans as a contingent liability, that the loans were neither necessary for operation of the hospital nor being used for that purpose,

and that Solomon has converted the $33 million in loans for its own use. The complaint also alleges that Solomon has never had to draw on the $10 million credit line. At argument before us, Solomon's attorneys conceded that the $33 million is presently invested outside New Jersey for purposes unrelated to the operation of the hospital.

## II

The New Jersey Constitution, in pertinent part, states that "[n]o county ... shall hereafter give any money or property, or loan its money or credit, to or in aid of any individual, association or corporation...." *N.J. Const.* Art. VIII, § 3, ¶ 2.

In *Roe v. Kervick,* 42 *N.J.* 191, 199 *A.2d* 834 (1964), which concerned the validity of loans to aid redevelopment under a State statute, the Court held that notwithstanding the seemingly broad language of the constitutional provision, the State and local governmental entities may offer loans to private entities if they are performing a public function on behalf of the public entity:

[T]he prohibition against lending of credit or money does not mean that the State and its political subdivisions cannot buy and pay for what they need to achieve public purposes. Nor do they signify that governmental units cannot employ the services of a third person or corporation to do any lawful act which they have the right to have done, and to pay for it. It seems to follow, therefore, that if the purpose of a statute be public, as it clearly is here, the *means of accomplishing it* laid down thereby ought to be regarded as a matter of valid legislative policy *so long as the means are restricted to the public end by the legislation and contractual obligation.*

[*Id.* at 217, 199 *A.2d* 834 (emphasis added) (citations omitted).]

In the instant case, plaintiffs properly admit that the LOA is intended to serve a public purpose, but they contend that the loans granted by the BCIA to Solomon were unsupported by consideration and were not and are not "means" adequately restricted by the written agreements to serve the public end.

In *Roe,* the loans were not to exceed "10% of the cost of establishing an area redevelopment project." *Id.* at 198, 199 *A.2d* 834. The Court said that such a loan "would be so closely allied with the effectuation of such purpose that the private benefit

radiating therefrom would be subordinate and incidental" to the primary objective, "relief of unemployment." *Id.* at 219, 199 *A.*2d 834. Putting the proposition somewhat differently, the Court said that the "public money" lent must be "assigned to bringing the public purpose to fruition" and the private entity's "business activity" must be "so strictly pointed in that direction, that for practical purposes [the private entity] represents the controlled means by which the government accomplishes a proper objective." *Id.* at 219–20, 199 *A.*2d 834.

The Court also stressed that "the [public funds cannot] be loaned to a private agency to be used as the agency pleased. Clearly the Constitution would stand in the way." *Id.* at 222, 199 *A.*2d 834. In short, *Roe* stands for the proposition that when a public entity's loan is reasonably related to achieving a public purpose and the loan's "use [is] confined to the execution of that purpose through a reasonable measure of control by a public authority by means of contractual stipulation" or otherwise, the loan does not violate the State Constitution. *Ibid.* Such a loan may provide an "incidental private benefit" without violating the Constitution so long as the loan's primary objective is to serve the public purpose. *Id.* at 222–23, 199 *A.*2d 834.

The principles of *Roe* were applied in *New Jersey Mortgage Finance Agency v. McCrane,* 56 *N.J.* 414, 267 *A.*2d 24 (1970), with the Court sustaining as constitutional governmental loans to mortgage lenders so that more funds would be available to alleviate the severe shortage of housing. The Court was satisfied that the State agency retained sufficient control of its loans because each mortgage lender receiving a loan had to provide evidence satisfactory to the agency that it was using the loan to make new residential mortgages as required by the law and had to allow the agency to inspect its book and records in that regard. *Id.* at 424, 267 *A.*2d 24. The Court summarized its conclusion in this way:

Thus, the participating private lenders are more than mere borrowers; they become agencies which are required to implement the public purposes of the Law, *i.e.,* to issue new residential mortgages. Finally, any private gains by the mortgag-

ees are merely incidental to the achievement of that purpose. Such incidental private benefit is permissible under our cases.

[*Ibid.* (citation omitted).]

In *City of Bayonne v. Palmer*, 47 *N.J.* 520, 522–30, 221 *A.*2d 741 (1966), the Court accepted and applied a related rule of law; namely, that an agreement violates the constitutional article cited above if it involves the transfer of public funds to a private entity but is unsupported by consideration flowing to the governmental entity. Or, as we put it in *City of East Orange v. Board of Water Commissioners*, 79 *N.J.Super.* 363, 371, 191 *A.*2d 749 (App.Div.), *aff'd on other grounds*, 41 *N.J.* 6, 194 *A.*2d 459 (1963), "[i]t is settled that the receipt of a grossly insufficient benefit by a municipality will not prevent a substantial donation by the public from being considered an unconstitutional gift."

Defendants concede that given the procedural posture of this case, dismissal of the complaint for failure to state a claim, our review is governed by these principles: we must search the complaint

"in depth and with liberality to ascertain whether the fundament of a cause of action may be gleaned even from an obscure statement of claim, opportunity being given to amend if necessary." At this preliminary stage of the litigation [a][c]ourt [should not be] concerned with the ability of plaintiffs to prove the allegation contained in the complaint … [P]laintiffs are entitled to every reasonable inference of fact. The examination of a complaint's allegations of fact required by the aforestated principles should be one that is at once painstaking and undertaken with a generous and hospitable approach.

[*Printing Mart–Morristown v. Sharp Elecs. Corp.*, 116 *N.J.* 739, 746, 563 *A.*2d 31 (1989) (quoting *Di Cristofaro v. Laurel Grove Mem. Park*, 43 *N.J.Super.* 244, 252, 128 *A.*2d 281 (App.Div.1957)) (citations omitted).]

And plaintiffs properly concede that at this procedural stage, our consideration of the documents referred to in the complaint, such as the LOA, the promissory note, and the supplemental agreement, is proper and does not convert defendants' *R.* 4:6–2(e) motions into motions for summary judgment. *See, e.g., In re Burlington Coat Factory Sec. Litig.*, 114 *F.*3d 1410, 1426 (3d Cir.1997). Both sides agreed at oral argument that our decision must be based solely on the complaint and the documents to which it referred.

Therefore, we accept plaintiffs' version of the facts, considered in light of the contractual documents, as true. We also accord their version all legitimate inferences, but we do so solely for the purpose of reviewing the motion to dismiss, while withholding judgment on the truth of the facts alleged.

### III

Initially, we consider plaintiffs' allegation that the loans were unsupported by any consideration, turning first to the Accounts Receivable Loan.

As noted above, Section 5.1(f) of the LOA expressly provides the BCIA may deduct from the monthly management fee payments due from Solomon on the pre-existing accounts receivable it collects. That LOA section further states that the deductions must be made "in accordance with the terms of a promissory note to be executed by the Manager setting forth, among other things, the amounts to be repaid and the date of repayment." Read reasonably, those provisions contemplate a loan to Solomon of the pre-existing accounts receivable. And consideration for the loan is apparently supplied by Solomon's LOA duties. Thus, plaintiffs' complaint, considered in relation to the contractual documents, fails to allege a complete lack of consideration for this loan.

On the other hand, plaintiffs' claim that the Working Capital Loan lacked consideration may have merit because neither the LOA nor the supplemental agreement refer to it. For reasons not supported by evidence at this stage of the proceedings, the loan just appears in the promissory note. Defendants claim nonetheless that the supplemental agreement provided consideration for the Working Capital Loan, but it is not self-evident that the parties regarded it as such even though the promissory note and supplemental agreement were executed at or about the same time. For, as the court observed in *Wilentz v. Hendrickson*, 133 *N.J. Eq.* 447, 474, 33 *A.*2d 366 (Ch.1943), *aff'd*, 135 *N.J. Eq.* 244, 38 *A.*2d 199 (E. & A.1944), "[n]othing is consideration . . . that is not

regarded as such by both parties." This is a matter that warrants further exploration on remand.

■ Even if both loans were supported by some consideration, we must still consider the allegation that the consideration was inadequate. For example, the LOA contains no indication of the likely amount of collectible accounts receivable. Although the parties contemplated in the promissory note that the Accounts Receivable Loan would be approximately $15 million, as Solomon pursued its collection efforts, the loan turned out to be $27 million. Plaintiffs' claim that the consideration for either amount, and certainly for the larger amount, was grossly inadequate. The resolution of this issue requires further exploration of the facts. *See Jamouneau v. Local Gov't Bd.*, 6 *N.J.* 281, 290–91, 295, 78 *A.*2d 553 (1951); *City of East Orange, supra,* 79 *N.J.Super.* at 374, 191 *A.*2d 749.

Assuming that the supplemental agreement provided consideration for the Working Capital Loan, we cannot determine on this record whether the consideration provided to the BCIA by that agreement was adequate or so grossly inadequate as to run afoul of the State Constitution. It may be the latter, as plaintiffs allege, and they are entitled to an opportunity to prove it. *See Jamouneau v. Local Gov't Bd., supra,* 6 *N.J.* at 295, 78 *A.*2d 553; *City of East Orange, supra,* 79 *N.J.Super.* at 374, 191 *A.*2d 749.

■ Perhaps most significant is plaintiffs' claim that both loans violate the Constitution because they were not confined to execution of the public purpose; i.e., operation of the hospital. Apart from the extremely generous terms of those loans, no interest required for eight years on the Working Capital Loan and for sixteen years on the Accounts Receivable Loan, and no capital payment required on the latter until three years after the expiration of the lease, plaintiffs allege that neither loan was necessary for or ever used for the public purpose.

In essence, defendants argue that Solomon's agreement to operate the hospital and to use the loans "in its sole discretion for

or with respect to the provision of Management Services at" the hospital, meets the requirements set forth in *Roe* because Solomon's operation of the hospital serves the intended public purpose. But that proposition is inconsistent with the principles enunciated in *Roe*.

■ *Roe* gives public entities broad discretion in selecting the means for accomplishing the public purpose, but it insists that the means must be "restricted to the public end by the ... contractual obligation." 42 *N.J.* at 217, 199 *A*.2d 834. Although the public entity may lend money to the private entity chosen to carry out the public purpose, any private benefit from the loan must be "subordinate and incidental" to achievement of the public end. *Id.* at 219, 199 *A*.2d 834. And the private entity cannot be allowed to use the loan as it pleases. *Id.* at 222, 199 *A*.2d 834.

Defendants rely on the consideration provided by Solomon's agreement to operate the hospital and the promissory note's stipulation that the loans "shall be used by Solomon in its sole discretion for or with respect to the provision of Management Services" at the hospital. But operation of the hospital is not enough unless the loans are limited to carrying out that purpose. Therefore, we must consider whether the just-quoted limiting terms of the promissory note provide the necessary controls called for by *Roe*.

■ Had the note stated that the loans had to be used "for" the management of the hospital, defendants' position would be stronger and perhaps sound. But the additional phrase—"or with respect to" such management—at least suggests a broader and less limiting purpose. In short, it introduces ambiguity as to the limits, if any, placed on the loans. As the Court noted in *County of Morris v. Fauver*, 153 *N.J.* 80, 103, 707 *A*.2d 958 (1998), "[w]here a contract is ambiguous, courts will consider the parties' practical construction of the contract as evidence of their intention and as controlling weight in determining a contract's interpretation. ..." The complaint alleges that by their conduct the parties have treated this aspect of the promissory note as permitting

Solomon to use the proceeds of the loans as it pleases and for purposes unrelated to operation of the hospital. Consequently, plaintiffs have stated a cause of action on which relief can be granted. Whether the loans are otherwise defensible, or not, will have to await further development of the record.[1]

Reversed and remanded.

---

[1] Read indulgently, as we are required to do, the complaint may be understood to challenge, as well, the constitutionality of the management fee of $108 million per year since in addition to that Solomon receives payment from the recipients of its services at the hospital. Whether the "fee" is so excessive that it amounts to an inappropriate gift, or is justified by the services provided by Solomon, cannot be determined in this procedural setting. Moreover, the point has not been briefed, and further discussion would therefore be inappropriate.