**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-3674-18

BRDL, LLC,

      Plaintiff-Appellant,

v.

RD LEGAL FUNDING, LLC,
and RONI DERSOVITZ,

      Defendants-Respondents.

_____

Argued April 20, 2020 – Decided April 16, 2021

Before Judges Ostrer and Vernoia.

On appeal from the Superior Court of New Jersey, Law Division, Bergen County, Docket No. L-3019-18.

Constantine D. Pourakis (Stevens & Lee, PA) of the New York bar, admitted pro hac vice, argued the cause for appellant (Stevens & Lee, PA, attorneys; Andreas D. Milliaressis and Constantine D. Pourakis, on the briefs).

Kevin J. Musiakiewicz argued the cause for respondents (Calcagni & Kanefsky, attorneys; Eric T. Kanefsky, of counsel and on the brief; Kevin J. Musiakiewicz and Martin B. Gandelman, on the brief).

The opinion of the court was delivered by

OSTRER, J.A.D.

This appeal involves the effect of a contractual anti-assignment clause under Delaware law. In particular, we must determine whether plaintiff BRDL, LLC may assert claims it was assigned against defendants RD Legal Funding, LLC (Funding) and Roni Dersovitz.

In 2006, Funding entered into an agreement with RD Legal Holdings, LLC (Holdings) to manage certain investments. The parties' final agreement contained a clause that barred assignment without their consent. A few years later, Holdings and its parent entered bankruptcy. The parent assigned its interests in Holdings to Buchwald Capital Advisors, LLC (BuchCap) and Michael Morrison, who were subsequently unable to sell those interests to benefit the bankruptcy estate. The bankruptcy proceedings closed in 2016. The following year, BuchCap and Morrison assigned Holdings's claims against defendants to BRDL. Lee Buchwald is BRDL's managing member.

Based on the assignment, BRDL now contends it has standing to assert claims against defendants for breach of contract, breach of fiduciary duty, and failure to pay six separate promissory notes. Defendants argue that the anti-assignment clause in the agreement between defendants and Holdings denies

2

BRDL standing. Because we agree with the trial court that the anti-assignment clause bars BRDL from asserting its claims, we affirm.

I.

In March 2006, Holdings was formed as a subsidiary of New Stream Secured Capital, LP (New Stream). Holdings invested in law firms, by loaning them money, and acquiring an interest in fees the firms recovered if their cases ended favorably. Holdings and Funding entered into a management agreement. Funding agreed to act on Holdings's behalf to find and evaluate investments, to service the investments, and to account for payments received. Dersovitz signed the agreement as Funding's managing member. He also personally agreed to abide by selected provisions of the agreement.

The original management agreement contained a "one-way" anti-assignment clause, prohibiting Funding from assigning the agreement without Holdings's written consent. However, the parties amended the agreement in 2007. The amended agreement included a mutual anti-assignment clause. The agreement barred assignment by either party and expressly declared any assignment "void." The agreement stated: "Each party agrees that it shall not assign this Agreement or any of its rights or obligations hereunder without the

A-3674-18

prior written consent of the other party, and any purported such assignment shall be void . . . ."

However, the agreement included an exception that allowed Holdings, without Funding's consent, to assign all Holdings's rights "(but not less than all) of its rights . . . to another wholly-owned subsidiary of New Stream Secured Capital, L.P." But, such an assignment had to meet three pre-conditions. First, "the assignee [had to] expressly assume[] and agree[] to perform all of the obligations of [Holdings] under [the] Agreement." Second, the assignment could not "relieve [Holdings] of its obligations under [the] Agreement." Third, Holdings had to give Funding "written notice of such assignment and assumption, in reasonable detail, promptly after the effectiveness thereof."

The agreement defined "assignment" to mean "any direct or indirect transfer or hypothecation of the contract or the beneficial ownership of a controlling block of outstanding voting securities by a security holder of [Funding] or [Holdings]." The management agreement also contained a choice of law provision, requiring disputes be decided according to Delaware law.

As part of the parties' integrated agreement, Holdings and Funding also entered into a Collateral Sharing Agreement, which governed how they would share and distribute investment proceeds.

A-3674-18

New Stream filed a Chapter 11 bankruptcy petition in March 2011. In January 2012, Holdings and another entity, RDLF Business Capital, LLC entered into an agreement to sell to Funding its interests in certain legal fees for $1.4 million, payable in ninety days. However, after paying a $100,000 deposit, Funding allegedly failed to remit the remaining amount when due.

New Stream filed a plan of reorganization in March 2012. The plan "provided that Class A Interests in New Stream would receive 85% membership interest in [Holdings], and Class B Interests in New Stream would receive 15% membership interest in [Holdings]." The Bankruptcy Court confirmed the plan one month later.

In May 2012, New Stream entered into an "Assignment of Membership Interest," which assigned to Buchwald Capital Advisors, LLC, as Liquidating Trustee, and Michael Morrison, as Joint New Stream Secured Capital Receiver, all of New Stream's interest in "100% of the membership interest . . . in [Holdings], to be held pursuant to that certain Amended and Restated Operating Agreement of [Holdings]." The plan also created a "Wind Down Oversight Committee" charged with overseeing liquidation of the estate's assets. The committee consisted of five individuals, including Lee Buchwald.

A-3674-18

In January 2016, the Bankruptcy Court issued a final decree and order, closing the New Stream bankruptcy proceedings.

Over a year and a half after the bankruptcy proceedings were closed, Holdings's interests were assigned again. In September 2017, BuchCap and Morrison caused Holdings to assign its membership interests to BRDL, then a newly-formed entity. Expressly included among Holdings's interests were any claims it had against Funding and Dersovitz under the management agreement as amended, and the January 2012 sale agreement.

Buchwald later certified that before that assignment, the Wind Down Oversight Committee, "[i]n or about 2017 . . . received access to a large amount of documentation relating to the investments of [Funding] in the RD Law Firms on behalf of [Holdings]." The committee tried to sell the potential claims against the law firms, but it received only one unsatisfactory bid. After the committee "decided to abandon the assets," deeming pursuit of the claims "too speculative and costly," BRDL offered to purchase the Holdings claims, and the committee accepted the offer.

BRDL then pressed Holdings's claims. In November 2017, BRDL sent a notice to Funding terminating the management agreement, thus ending Funding's authority under the agreement. At the same time, it allegedly gave

6

defendants notice of the assignment. BRDL asserts Funding and Dersovitz converted over $1 million in collections owed to Holdings. BRDL asserted that Funding defaulted in its payments on the six promissory notes, almost $400,000 in all, as of November 30, 2017.

In April 2018, BRDL filed suit against defendants, asserting six causes of action. BRDL alleged conversion; turnover; accounting; breach of fiduciary duty; breach of contract; and default in the payment on six promissory notes.

Defendants moved to dismiss the complaint in lieu of filing an answer. After argument, the court dismissed the complaint without prejudice on statute of limitations grounds. After BRDL filed an amended complaint, the trial court granted defendants' renewed motion to dismiss, this time on the basis that BRDL lacked standing, because the anti-assignment clause invalidated the assignment of interests to BRDL.

BRDL now appeals, asserting the trial court erred in finding it did not have standing. BRDL argues that the anti-assignment clause does not govern assignment of economic interests; the clause does not apply because the critical assignment occurred within the bankruptcy; defendants cannot enforce the clause because of their own breach; and defendants waived the clause. BRDL

also contends it has standing to assert non-contractual claims against Funding and Dersovitz.

## II.

We review de novo the trial court's order dismissing BRDL's complaint for failure to state a claim. Dimitrakopoulos v. Borrus, Goldin, Foley, Vignuolo, Hyman & Stahl, P.C., 237 N.J. 91, 108 (2019). We apply the same standard of review to the trial court's interpretation of a contract. Serico v. Rothberg, 234 N.J. 168, 178 (2018). In exercising that review, we "assume that the nonmovant's allegations are true and give that party the benefit of all reasonable inferences." NCP Litig. Tr. v. KPMG LLP, 187 N.J. 353, 365 (2006). Also, we may consider documents attached to the complaint and documents upon which the complaint is based, without converting the motion to one for summary judgment. Banco Popular N. Am. v. Gandi, 184 N.J. 161, 183 (2005); N.J. Citizen Action, Inc. v. Cty. of Bergen, 391 N.J. Super. 596, 605 (App. Div. 2007).

We first consider BRDL's challenge to the court's decision enforcing the anti-assignment clause. Delaware law unquestionably governs the assignment under the agreement's choice of law provision. BRDL mainly argues that

Delaware law permits assignment of "economic rights" despite anti-assignment clauses, and that it seeks only to enforce its Holdings's economic rights.

But, BRDL misreads Delaware law. Although Delaware courts narrowly construe anti-assignment clauses "because of the importance of free assignability," the courts also recognize such clauses' validity. In re Woodbridge Grp. of Cos., LLC, 606 B.R. 201, 205 (D. Del. 2019); see also Paul v. Chromalytics Corp., 343 A.2d 622, 625 (Del. Sup. Ct. 1975) (stating that courts have "invariably" upheld clauses like one stating that an assignment of an agreement or rights thereunder without consent "shall be void").[1]

We acknowledge that a contract may bar assignment of rights, without barring assignment of damage claims. And BRDL contends it seeks only to enforce assigned claims. But, the intent of the parties in the original agreement dooms BRDL's argument.

---

[1] BRDL does not cite a precedential opinion of the Delaware Supreme Court. Instead, it relies on an unreported Delaware Superior Court trial opinion. Although Delaware courts accord unreported opinions "great deference," they are "not necessarily stare decis[is]." Aprahamian v. HBO & Co., 531 A.2d 1204, 1207 (Del. Ch. 1987). In any event, we may not cite unreported opinions. R. 1:36-3; Badiali v. N.J. Mfrs. Ins. Grp., 220 N.J. 544, 559 (2015) (citing R. 1:36-3). So, we rely only on reported authority to predict how Delaware's Supreme Court would interpret the anti-assignment clause here.

"A contract term prohibiting assignment of rights under the contract, unless a different intention is manifested . . . does not forbid assignment of a right to damages for breach of the whole contract or a right arising out of the assignor's due performance of his entire obligation." Restatement (Second) of Contracts, § 322(2) (Am. Law Inst. 1981) (emphasis added); see also Kent Gen'l Hosp. v. Blue Cross & Blue Shield of Delaware, Inc., 442 A.2d 1368, 1370 (Del. 1982) (distinguishing between an insured's assignment of a health insurance policy, which may alter the risk, and an insured's assignment "of the mere right to receive payment," noting that courts may enforce provisions barring the former but not the latter).

Similarly, there is a difference between "the right to assign" a contract, and "the power to assign" one. Woodbridge, 606 B.R. at 207. Absent contrary intent, a party who violates a limit on the right to assign will be liable for damages, but the assignment would be effective. In re Woodbridge Grp. of Cos., LLC, 590 B.R. 99, 103-04 (Bankr. D. Del. 2018), aff'd, 606 B.R. 201 (D. Del. 2019). But, if a party violates a limit on the power to assign, the assignment would be null and void. Ibid.

In Woodbridge, the Delaware Bankruptcy Court addressed the promisees' assignment of their claim to payment under three promissory notes that each

A-3674-18

stated: "No Assignment. Neither this Note . . . nor all other instruments executed or to be executed in connection therewith . . . are assignable by [the promisees] without the [promisor's] written consent and any such attempted assignment without such consent shall be null and void." Woodbridge, 606 B.R. at 203. The District Court affirmed the Bankruptcy Court's determination that the original parties to the note expressly limited the power to assign. They did so by expressly stating that any unconsented assignment of the notes would be "null and void." Id. at 207.

Likewise, the Supreme Court of Delaware in Kent General Hospital rejected an argument that a provision barring insureds from assigning their right to payment from their insurer violated public policy and the "free assignment of the right to receive money." 442 A.2d at 1370-72. In that case, the clause stated that the insurer retained "full and exclusive discretion in determining who shall receive payment" and "[s]uch payment shall not be assignable without [the insurer's] . . . written approval." Id. at 1370. Notably, the assignment prohibition did not expressly use the terms "null and void."

We are confident that under Delaware law, the anti-assignment clause effectively denies BRDL the right to assert Holdings's payment claims. The parties agreed they would "not assign this Agreement or any of its rights or

obligations hereunder without the prior written consent of the other party." And, as in the assignment in <u>Woodbridge</u>, the parties agreed that "any purported such assignment shall be void." The language of the anti-assignment clause is all-encompassing. Thus, it "manifests both a clear intention to forbid the assignment of the [Management Agreement] itself, and any rights thereunder." <u>Woodbridge</u>, 590 B.R. at 105.

BRDL also challenges the anti-assignment clause on the non-textual grounds that the Bankruptcy proceedings rendered its assignment incontestable; the Uniform Commercial Code trumps the anti-assignment clause; defendants' alleged breach prevents them from invoking the anti-assignment clause; and defendants waived their right to invoke the anti-assignment clause. These arguments lack merit.

Even if we accepted BRDL's argument that § 365(f) of the Bankruptcy Code permitted assignment of the agreement despite the anti-assignment clause, the Code's purpose was met when the Bankruptcy Court assigned Holdings's interest to the Wind Down Committee.[2] The committee declined to pursue

---

[2] Section 365(f) allows a trustee to assign leases and executory contracts despite anti-assignment clauses. However, it is far from clear that the promissory notes upon which BDRL has sued are "executory contracts" under that section. One federal court "has defined an executory contract as 'a contract under which the

collection and could not find a willing buyer before the bankruptcy proceedings closed in January 2016. The record includes no sign that BuchCap or Morrison tried to re-open the proceedings, although assigning Holdings's claims for payment would have benefited the estate. See 11 U.S.C. § 350(b) (stating that a closed case "may be reopened in the court in which such case was closed to administer assets, to accord relief to the debtor, or for other cause"). Nor does BRDL cite authority that the Code nullifies a contractual limitation on an assignment made, as here, after the bankruptcy closed. Rather, the Code contemplates the assignee will, post-assignment, abide by an assigned contract's terms. The Code does so by allowing a trustee to assign an executory contract, despite an anti-assignment clause, "only if . . . adequate assurance of future performance by the assignee of such contract . . . is provided . . . ." 11 U.S.C. § 365(f)(2)(b).

---

obligation of both the bankrupt and the other party to the contract are so far unperformed that the failure of either to complete performance would constitute a material breach excusing the performance of the other.'" In re Craig, 144 F.3d 593, 596 (8th Cir. 1998) (quoting Northwest Airlines, Inc. v. Klinger (In re Knutson), 563 F.2d 916, 917 (8th Cir. 1977)). Applying that definition, the court found that a promissory note was not an executory contract, where one party had completed its performance and "was merely awaiting payment." Ibid. Other courts have come to the same conclusion. See e.g. Forlini v. Ne. Sav. F.A., 200 B.R. 9, 12 (D.R.I. 1996); In re Rose, 21 B.R. 272, 275 (Bankr. D.N.J. 1982).

A-3674-18

Also, BRDL mistakenly invokes Article 2 of Delaware's Uniform Commercial Code to contend that "[a] right to damages for breach of the whole contract . . . can be assigned despite agreement otherwise." (Citing Del. Code Ann. tit. 6, § 2-210). But, Article 2 "applies to transaction in goods." See Del. Code Ann. tit. 6, § 2-102. By contrast, the management agreement between Holdings and Funding involved services. See AES Puerto Rico, L.P. v. Alstom Power, Inc., 429 F. Supp. 2d 713, 718–19 (D. Del. 2006) (applying Delaware law, and noting that § 2-210 does not apply when the service portion of a contract predominates). Article 2 simply does not apply.

Nor does defendants' alleged breach vitiate their right to enforce the anti-assignment provisions. Both the bankruptcy court and the district court in Woodbridge rejected a similar argument. 606 B.R. at 207-08; see also 590 B.R. at 105-07. The court held, "It is axiomatic that a non-breaching party may not emerge post-breach with more rights than it had pre-breach." Id. at 106. Likewise, here, even assuming for argument's sake that defendants breached their agreement with Holdings, nothing in the agreement provides that such breach vitiates the anti-assignment clause.

We also reject BRDL's claim that defendants waived the anti-assignment clause by confirming in emails that it owed money to Holdings. "Waiver is the

14

voluntary and intentional relinquishment of a known right." Realty Growth Inv'rs v. Council of Unit Owners, 453 A.2d 450, 456 (Del. 1982) (citing 28 Am. Jur. 2d, Estoppel and Waiver § 158 (1966)). "It implies knowledge of all material facts, and intent to waive." Ibid.; see also AeroGlobal Capital Mgmt., LLC v. Cirrus Indus., Inc., 871 A.2d 428, 444 (Del. 2005).

BRDL cites email exchanges in which defendants discussed with Holdings paying the promissory notes. But the emails were sent in 2015, two years before the assignment to BRDL, and in 2017, before defendants received notice of the assignment. Defendants could hardly voluntarily and intentionally relinquish their right to object to an assignment that did not exist, or that they did not know existed. See Paul, 343 A.2d at 626 (rejecting an argument that a party waived its right to object to an assignment noting the lack of clear proof of the purpose to waive).

Finally, we reject BRDL's contention that some of its claims are extra-contractual and, therefore, untouched by the anti-assignment clause. BRDL's claims for breach of fiduciary duty, conversion, turnover, and accounting arise out of, and are intertwined, with Funding's contractual duties. Without the right to enforce the contract, BDRL lacks standing to enforce those claims, too. See Nemec v. Shrader, 991 A.2d 1120, 1129 (Del. 2010) (stating that "where a

dispute arises from obligations that are expressly addressed by contract, that dispute will be treated as a breach of contract claim," and that breach-of-fiduciary-duty claims "arising out of the same facts that underlie the contract obligations would be foreclosed as superfluous"); Kuroda v. SPJS Holdings, LLC, 971 A.2d 872, 889-90 (Del. Ch. 2009) (dismissing conversion claim that arose out of a breach of contractual duty).

To the extent not addressed, BRDL's remaining arguments lack sufficient merit to warrant discussion in a written opinion. R. 2:11-3(e)(3)(E).

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-3674-18